Patrick H. DIAMOND, Appellant,

v.

Carle E. DAVIS, et al., Appellees.

No. 93–CV–1246.

District of Columbia Court of Appeals.

Argued Jan. 4, 1995.

Decided Feb. 20, 1996.

Patrick H. Diamond, pro se.

Paul E. Mirengoff, with whom Robert F. Brooks, Washington, DC, was on the brief, for appellees.

Before FERREN and RUIZ, Associate Judges, and KERN, Senior Judge.

PER CURIAM:

The judgment of the trial court is affirmed pursuant to Part II of Judge RUIZ's opinion, the concurring opinion of Judge KERN, and Part I of the opinion of Judge FERREN concurring in the judgment.

RUIZ, Associate Judge, concurring in part and dissenting in part:

This appeal presents the question whether the law imposes upon the plaintiff a different duty of care in discovering a cause of action involving fraud or fraudulent concealment on the part of a professional than in other cases where the discovery rule is applied—primarily causes of action for professional malpractice. We hold that in both kinds of cases the same standard of reasonable diligence under the circumstances applies. As in other cases where we apply the discovery rule, the inquiry is highly fact-bound. Thus, the character of material statements and nondisclosure by the defendant as well as the existence of a relationship of trust between the plaintiff and the defendant, which are usual in cases involving fraud or fraudulent concealment, are properly taken into account by the trier of fact in evaluating the reasonableness of plaintiff's diligence.

In September 1989, appellant, Patrick H. Diamond filed a complaint against his former attorneys, members of the firm of McGuire, Woods, Battle & Boothe,[1] asserting claims arising out of actions from April 1983 to April 1986 when the firm represented him in a dispute with the Internal Revenue Service regarding his 1980 and 1981 tax filings. The I.R.S. dispute and McGuire, Woods's representation ended with a final judgment of conviction against Diamond for federal criminal tax fraud. Diamond appeals the dismissal of his unfair trade practices claim[2] and the

---

1. At the time of the events giving rise to this action, the firm was known as McGuire, Woods & Battle. In this opinion, the firm is referred to as McGuire, Woods.

2. We affirm dismissal of Diamond's claim to recover for unfair trade practices allegedly engaged in by McGuire, Woods. Diamond attempts to state a claim under the D.C. Consumer Protection Procedures Act, D.C.Code §§ 28–3901

entry of summary judgment against him on McGuire, Woods's statute of limitations defense as to his claims for fraud, breach of professional and fiduciary duties, breach of contract, intentional infliction of emotional distress, and common-law conspiracy.[3]

The court affirms the judgment on the ground that, applying the discovery rule, the complaint was filed outside the three-year limitations period.[4] I dissent from the affirmance because I believe there is on this record a genuine issue of material fact regarding whether Diamond discovered or, in the exercise of the requisite degree of diligence, should have discovered his cause of action more than three years before he filed his complaint.

## I.

### Diamond's Claim and the Record

The gist of Diamond's allegations is that McGuire, Woods conspired with Judge Robert R. Merhige of the United States District Court for the Eastern District of Virginia to have Diamond convicted in the criminal prosecution for tax fraud. McGuire, Woods allegedly did that to aid its long-time clients, Reynolds Metals, Inc. and the Reynolds family. Judge Merhige was motivated, according to Diamond, by loyalty to the Reynolds family, who had supported his nomination to

the federal bench by President Johnson and with whom Judge Merhige had business dealings. Judge Merhige and McGuire, Woods were connected by virtue of legal work that the firm had done over a number of years for Judge Merhige. The conviction could be expected to benefit Reynolds Metals because Diamond had sued Reynolds Metals in federal court, claiming that Reynolds Metals had wrongfully exercised control over Diamond's former employer, Robertshaw Controls Co., and caused him to be fired from his positions as vice president in charge of finance and director of Robertshaw. Pursuant to the Federal Rules of Evidence, the felony conviction in the criminal prosecution for tax fraud, in which McGuire, Woods allegedly conspired with Judge Merhige, could be used to impeach Diamond's credibility in the civil suit.

The factual issues in this case and the evidence bearing upon them may be placed in three categories. First, there are the largely uncontested facts concerning the timing of events in Diamond's civil and criminal matters. Second, there are the sharply disputed facts regarding when and how much information McGuire, Woods disclosed to Diamond concerning the firm's work for Reynolds Metals and members of the Reynolds family. Third, there are the closely related and equally disputed matters of how much Dia-

---

to –3909 (1991). Specifically, he relies on § 28–3905(k)(1), which provides:

> Any consumer who suffers any damage as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia *within the jurisdiction of the Department* [of Consumer and Regulatory Affairs] may bring an action in the Superior Court of the District of Columbia to recover or obtain any of the following:
> (A) treble damages;
> (B) reasonable attorneys' fees;
> (C) punitive damages;
> (D) any other relief which the court deems proper.

(emphasis added).

The jurisdiction of the Department of Consumer and Regulatory Affairs does not extend to professional services of lawyers. D.C.Code § 28–3903(c)(2)(C); *see also Banks v. Department of Consumer & Regulatory Affairs*, 634 A.2d 433, 437 (D.C.1993) (noting that although the Act expressly excludes from its purview the professional services of lawyers, it does not exclude

nonlawyers who purport to provide legal services). Hence, the scope of the cause of action created by § 28–3905(k)(1) is similarly limited.

**3.** Diamond does not appeal the dismissal of his claims for false imprisonment, statutory conspiracy under Va.Code § 18.2–499, –500(a) (1988), and unjust enrichment. At Diamond's request, the trial court struck a claim under a theory denominated "tort of outrage."

**4.** The parties appear to have assumed that a three-year limitations period applies to each of Diamond's actions. Statutory and case authority supports their implicit agreement. *See* D.C.Code § 12–301(7) (1989) (contract); *King v. Kitchen Magic, Inc.*, 391 A.2d 1184, 1186 (D.C.1978) (fraud); *Saunders v. Nemati*, 580 A.2d 660, 665 (D.C.1990) (intentional infliction of emotional distress); *Knight v. Furlow*, 553 A.2d 1232, 1233 (D.C.1989) (breach of professional duty); *Thomas v. News World Communications*, 681 F.Supp. 55, 73 (D.D.C.1988) (holding that limitations period for civil conspiracy established by limitations period for underlying tort).

mond knew about the work McGuire, Woods was doing for Reynolds Metals and the Reynolds family, and when he knew it, apart from whatever information McGuire, Woods may have disclosed.

## A.

### The Facts Not Contested by the Parties

The following are the apparently undisputed facts concerning the timing of events in Diamond's civil and criminal matters: In April 1983, Diamond retained McGuire, Woods to represent him in a tax dispute with the Internal Revenue Service. He did so because his accountants had suggested the name of a McGuire, Woods partner, appellee Carle E. Davis. The tax controversy appears to have stemmed from Diamond's reporting of losses resulting from his trading of commodity futures and stock options in 1980 as ordinary business losses instead of capital losses, as he had for previous and subsequent years. *United States v. Diamond,* 788 F.2d 1025, 1026–27 (4th Cir.1986). Diamond's principal defense, pressed unsuccessfully by his McGuire, Woods attorneys, was that Diamond lacked the requisite criminal intent in that he believed in good faith that because of the extent of his trading efforts in 1980, he was engaged in a business, notwithstanding the fact that his trades were entirely for his own account. *Id.* at 1028.

In May 1984, while the tax matter was pending, Diamond filed a suit in federal court in Wilmington against his former employer, Robertshaw, along with Reynolds Metals, David P. Reynolds, and Ralph S. Thomas. David Reynolds was chairman of the board and chief executive officer of Reynolds Metals and also chairman of the board of directors of Robertshaw. Ralph Thomas was a member of the board of directors of Reynolds Metals and president and chief executive officer of Robertshaw. In the suit, Diamond contended that Reynolds Metals, Reynolds and Thomas had conspired to acquire control of Robertshaw, while rebuffing other corporate suitors willing to pay a substantial premium over the price at which stock in Robertshaw ordinarily traded. As part of an effort to acquire and preserve control over Robertshaw, Diamond contended that the de-

fendants in the civil suit caused Robertshaw to fire him in November 1983.

Meanwhile, Davis's efforts to resolve the tax matter without criminal charges were unsuccessful and a trial appeared likely. At a May 1, 1985 meeting, Davis introduced Diamond to the two McGuire, Woods attorneys who would handle the criminal trial, appellee J. Waller Harrison and Roger Frydrychowski. The case was ultimately assigned for trial to Judge Merhige. After receiving advice from his attorneys that a bench trial by Judge Merhige might be advantageous, Diamond waived his right to a jury. The case was tried to Judge Merhige, on September 27, 1985. Judge Merhige convicted Diamond of all the charges.

Diamond ultimately retained McGuire, Woods to handle the appeal as well. On March 6, 1986, Frydrychowski argued the appeal before the United States Court of Appeals for the Fourth Circuit. The court affirmed the conviction in a published opinion dated April 22, 1986. *Diamond, supra.* Diamond then served a sentence in a federal facility in Danbury, Connecticut, and was released January 22, 1987. On September 19, 1989, Diamond commenced this lawsuit in the Superior Court against defendants Davis, Harrison and several dozen other partners of McGuire, Woods, claiming that they conspired with each other and Judge Merhige to have Diamond convicted of tax fraud.

## B.

### Who Told Diamond What and When?

Although the question of McGuire, Woods's disclosures to Diamond is sharply disputed, the fact of the firm's long-standing representation of Reynolds Metals and the Reynolds family is not. In their answer to Diamond's complaint, the appellees conceded that at the same time McGuire, Woods was representing Diamond in the tax matter, it also represented Reynolds Metals in "one or two" federal suits pending in Richmond. In a deposition, Davis testified that McGuire, Woods had been handling "special matters" for Reynolds Metals for many years before Diamond became a client. Harrison, a part-

ner at McGuire, Woods, testified that he learned of the firm's representation of Reynolds Metals within a year or two of starting work at the firm. Frydrychowski testified to working on a Reynolds Metals matter while working on Diamond's case. In an affidavit submitted in opposition to McGuire, Woods's summary judgment motion, Diamond avers that a report by Reynolds Metals' accountant shows that the company paid McGuire, Woods a million dollars while the firm was representing Diamond in his tax matter. The appellees have not produced any evidence controverting that figure.

Central to Diamond's claims, with respect to both the merits of his action and the time it accrued, is his contention that McGuire, Woods never informed him that it also represented Reynolds Metals. In a deposition, Diamond testified that in June 1984, Davis mentioned during a phone call that he had seen an article in the Wall Street Journal about Diamond's civil action against Reynolds Metals, David Reynolds, Thomas and Robertshaw. In that same deposition, Diamond testified that it was not until spring 1985 that Davis first told him that he had prepared some tax returns for David Reynolds. Diamond denies that anyone at McGuire, Woods ever informed him that the firm had done work for Reynolds Metals or for other members of the Reynolds family.[5]

Diamond contends that he did not learn that McGuire, Woods had ever represented Reynolds Metals until November 1986, when he received, while incarcerated, a document filed by Reynolds Metals with the Securities and Exchange Commission during the previous month. He did not learn that there had been a simultaneous representation until early 1987, when he received a docket sheet from the federal district court in Richmond.

The appellees take a different position on the disclosure issue. In his deposition, Davis testified that he did not learn that Diamond had a civil suit against Reynolds Metals until the complaint in the instant action was served on him in November 1989. Harrison stated during his deposition that he had told Diamond several times that McGuire, Woods had long represented Reynolds Metals and the Reynolds family. He made those disclosures in response to Diamond's repeated attempts to discuss the civil matter with him, which he refused. In his deposition, Diamond specifically denied that Harrison had ever informed him of the representation or that Harrison had ever refused to discuss his civil suit.

Harrison also testified that Frydrychowski came to him a couple of months before the September 1985 criminal trial for tax fraud to ask whether the simultaneous representation of Diamond and Reynolds Metals was a problem. As he recalls, he told Frydrychowski that he did not think there was a conflict, but that he would consider the matter. For his part, Frydrychowski recalls bringing the matter to Harrison's attention, but remembers Harrison indicating that it had been taken care of by the partnership. Frydrychowski testified that he personally never told Diamond of McGuire, Woods's representation of Reynolds Metals.

Also pertinent to the disclosure issue is a meeting that took place on October 22, 1985, shortly after Diamond's criminal trial. The purpose of the meeting was apparently so that Diamond's criminal and civil counsel could discuss the advisability of an appeal in the criminal matter, as well as coordinate their respective efforts. Diamond, Harrison and Frydrychowski were present at the meeting, as were Harold E. Kohn and William Prickett, who were representing Diamond in his civil action.

Harrison testified that at the meeting, he told either Kohn or Prickett or both that he could not discuss the civil matter because Reynolds Metals was McGuire, Woods's client. Prickett, however, had no recollection of being told that McGuire, Woods represented Reynolds Metals, although he thought at the time of his deposition that it would have been important to him. Frydrychowski also

---

5. In fact, Diamond said that he was not sure that David Reynolds was represented by McGuire, Woods, as opposed to by Davis individually. He explained that he knew that Davis and David Reynolds lived on the same street in Richmond because he had in the past sent Christmas cards to both of them and had by coincidence previously seen David Reynolds on that street. He therefore thought that Davis may have done the work as a sort of favor to a neighbor.

did not recall any disclosure of the representation at the meeting. He testified that he left the October 22 meeting with a sense of the status of the civil suit because Diamond, Kohn and Prickett were "thinking out loud among themselves." The record does not contain any evidence concerning Kohn's recollections of the meeting.

## C.

### McGuire, Woods' Evidence

The appellees based their motion for summary judgment on what they contended were undisputed facts concerning Diamond's prior knowledge of McGuire, Woods' simultaneous representation of Reynolds Metals. Specifically, they asserted that it was undisputed that Diamond knew more than three years before the date on which he filed his complaint that McGuire, Woods represented Reynolds Metals.

The appellees relied principally on three documents that they had recently discovered in the files of Diamond's civil attorneys, arguing that in light of those documents, Diamond's statements denying such knowledge "are now known to be false." The first document contains handwritten notes of a telephone conversation between Diamond and William B. Lytton, one of the attorneys representing him in his action against Reynolds Metals. The pertinent notes state:

> IRS problem
>
> [illegible] losses as Trade or Business Ordinary Losses.
>
> difference of @ $50,000.
>
> Carle Davis—Richmond, Va.
>
> McGuire, Woods & Battle (also rep Reynolds Metals)
>
> OK for us to talk w/ them.

Lytton testified that the notes were in his handwriting. Although the notes appeared in the file between documents dated June 15, 1984 and August 9, 1984, Lytton could not say when the conversation took place or when he took the notes. He said he knew that he had spoken with Diamond about his tax problem, but he could not recall the particular conversation leading to the notes quoted above.

The second document the appellees relied on is a letter Diamond sent to Kohn, who had represented Diamond in the action against Reynolds Metals, two weeks before the meeting in Washington between Diamond's civil and criminal counsel:

Oct. 7, 1985

Dear Harold,

I enjoyed the opportunity last Thursday to sit down with you and your associates and to bring you up to date on the new development in Richmond.

Although I of course agree with you that it is a setback (unless the Wilmington Jury believes the defendants had a part in it), I think we should view it in a wider context.

Since we first met in January, 1984 and I told you the story, we have had nothing but good news in the case:

. . . .

We have ordered an expedited trial transcript [in the criminal case] and are now faced with the appeal process.

McGuire, Woods & Battle did a very good job at the trial, my problem wasn't with them but with the judge.

On the appeal, we'll have to point out evidence of bias by Merighe [sic], one of only 3 U.S. district court judges who sit in Richmond and possibly an inference of outside influence (Robertshaw or Reynolds).

*Since these two items might cause problems for a firm that has to deal with Merighe [sic] every day and which represents Reynolds*, would you consider it more effective if you take an active part in the appeal process, perhaps even arguing the appeal yourself?

Please let me know what your thoughts are on this subject.

(emphasis added).

The final document the appellees relied on accompanied a letter dated March 21, 1986 sent by Diamond to Kohn and Prickett. The letter addressed "certain information concerning Judge Robert Reynold [sic] Merhige which has just come to my attention." One of those items of information was that Judge Merhige had been an executor of the estate of a member of the Reynolds family, J. Sar-

geant Reynolds.[6] That fact was contained in a probate document dated October 29, 1971, which also indicated that the address of the estate was "Richard S. Reynolds, Jr., c/o Carle E. Davis, Esq., Attorney at Law, 1400 Ross Building, Richmond, Virginia." Along with the 1971 document, Diamond enclosed a copy of the final accounting of the estate, for the period January 1, 1977, to October 31, 1979, showing legal fees paid to McGuire, Woods in the amount of $37.50.[7]

In connection with his opposition to summary judgment, Diamond filed an affidavit attempting to explain how those documents could be consistent with his claim that he did not know that McGuire, Woods represented Reynolds Metals. With respect to Lytton's notes, Diamond stated that he had spoken with Lytton and told him that he thought he was "well represented, and that my lawyer was Carle E. Davis of McGuire Woods, who must know his tax stuff because he'd done Reynolds' taxes." Diamond said in his affidavit that he thought he had specified "David Reynolds," but was not certain because he would use the term "Reynolds" to refer to David Reynolds or Reynolds Metals or both. He explained that "in my mind, at least, Reynolds Metals was simply an extension of David Reynolds." He further stated that he was sure he had never before seen nor been offered the opportunity to review Lytton's notes. He specifically denied telling Lytton that McGuire, Woods represented Reynolds Metals.

6. The filial relation between J. Sargeant and David Reynolds is not clear from the record. In Diamond's March 1986 letter, he drew a family tree showing J. Sargeant to be David's son. In his brief, however, Diamond describes J. Sargeant as David's nephew. The appellees do not make any representations concerning the relationship.

7. Also attached to Diamond's March 1986 letter were two newspaper articles concerning Judge Merhige. One article, dated March 20, 1986, reported that Judge Merhige had given a criminal defendant an eighteen-month suspended sentence and five years' probation after he pleaded guilty to one count of tax fraud. Diamond perceived that article showed a bias on the part of Judge Merhige, because Judge Merhige had sentenced him to serve time on his two-count conviction.

The other article, dated March 5, 1986, reported that ten lawyers had demanded that Judge Merhige recuse himself from a bankruptcy mat-

With regard to the October 7, 1985 letter, Diamond explained in his affidavit that he was concerned that if McGuire, Woods were to argue the bias issue on appeal, it might appear that Davis had acquired the ammunition through the tax work he did for both David Reynolds and Judge Merhige. He also appeared to say that he thought the vigor with which McGuire, Woods would press the issue might understandably be dampened by the fact that it had to practice before Judge Merhige every day. Diamond's opposition and affidavit do not address the probate documents nor the two articles concerning Judge Merhige.

## II.

### The Legal Standard

■ What constitutes the accrual of a cause of action is a question of law. *See, e.g.,* *Bussineau v. President of Georgetown College,* 518 A.2d 423, 425 (D.C.1986). When accrual actually occurred in a particular case is a question of fact. *See, e.g., Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192, 1204 (D.C.1984). We first address the legal question.

The parties dispute the legal standard to be applied in determining when Diamond's causes of action accrued. Diamond contends that McGuire, Woods's fraud and fraudulent concealment of its wrongdoing delayed accru-

ter concerning A.H. Robins Co. The lawyers, who represented women with products liability claims against A.H. Robins, complained after Judge Merhige disbanded a creditors' committee for their claims, on which nine of the ten had sat. The article described the lawyers as citing "a web of personal and business friendships that they say calls the judge's impartiality into question and requires his disqualification." According to the article, A.H. Robins was and had been since 1975 represented principally by McGuire, Woods and Carle Davis, who according to the complaining lawyers, had served as Judge Merhige's lawyer " 'on several occasions over a number of years.' " The complaining lawyers said that "the prominence of the Robins company and the Robins family, together with the 'interwoven nature' of the city's lawyers and judges, should require that the case be assigned to a judge from outside Richmond."

al of his cause of action until such time as he had something close to actual notice of that cause of action. He relies on several cases decided by the federal courts of this jurisdiction, starting with *Hobson v. Wilson,* 237 U.S.App.D.C. 219, 253, 255 n. 113, 737 F.2d 1, 35, 37 n. 113 (1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Under that line of cases, according to Diamond, "a defendant who has engaged in fraudulent concealment, in order to make out a defense based on the plaintiff's lack of due diligence, must show something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment." *Riddell v. Riddell Washington Corp.,* 275 U.S.App.D.C. 362, 373, 866 F.2d 1480, 1491 (1989); *see also Jones v. Meridian Towers Apts.,* 816 F.Supp. 762, 770–71 (D.D.C.1993) (describing *Riddell* as imposing a "heightened notice" standard for fraud cases). Based on those cases, Diamond contends that the limitations period could not have begun to run until he had "something closer to actual notice" of his cause of action. According to Diamond, only such a quantum of information could trigger

a duty to investigate further McGuire, Woods's role in his conviction.

■ The appellees, on the other hand, contend that the same discovery rule we have announced for actions based on legal malpractice applies, regardless of any fraud or fraudulent concealment.[8] They rely on cases such as *Knight, supra* note 4, 553 A.2d at 1234 (adopting for actions for legal malpractice discovery rule under which "a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing" (citing *Bussineau, supra,* 518 A.2d at 425)), and *Weisberg v. Williams, Connolly & Califano,* 390 A.2d 992, 996 (D.C.1978) (" '[O]ne well established defense to a claim of fraudulent concealment is that the plaintiff knew, or by the exercise of due diligence could have known, that he may have had a cause of action.' ") (quoting *Westinghouse Electric Corp. v. City of Burlington,* 122 U.S.App. D.C. 65, 67, 351 F.2d 762, 764 (1965)).

Before turning to our discussion, we pause to set out an analytical framework and to

8. The appellees also contend that it is undisputed *that Diamond had actual knowledge of his cause* of action more than three years before he filed his complaint; hence, they contend that even under *Riddell,* Diamond's action is barred. Their argument that Diamond had actual knowledge is premised on their contention that prior to September 1986 "Diamond had *actual* notice of every fact cited in his Complaint as supporting his allegations of wrongdoing." If the statement were accurate, it would, of course, mean that Diamond had actual knowledge of his claim more than three years before he filed the complaint. To support their assertion, however, the appellees show only that the evidence Diamond chose to plead in his complaint—not the facts he had to plead to state a claim—was known to him more than three years before he filed the complaint.

The appellees' reasoning is flawed in two respects. First, it incorrectly assumes that Diamond's complaint had to plead evidence known to Diamond from which the conspiracy he alleges could be inferred—that is, evidence sufficient to have put Diamond on notice of his claim. Under the Superior Court Civil Rules, however, the plaintiff need only plead facts sufficient to put the defendant on notice of the claims brought against them. Super.Ct.Civ.R. 8(a); *Scott v. District of Columbia,* 493 A.2d 319, 323 (D.C.1985). A plaintiff need not plead his evidence at all.

The point is that allegations of facts in a complaint sufficient to meet notice pleading requirements are not necessarily the same as evidence of timely knowledge of facts sufficient to infer knowledge of a cause of action. In *Emmett v. Eastern Dispensary & Casualty Hosp.,* 130 U.S.App.D.C. 50, 396 F.2d 931 (1967), the D.C. Circuit rejected an argument similar to the one the appellees now press. In *Emmett,* the plaintiff contended that the defendants' refusal to release hospital records tolled the time for the plaintiff's malpractice action. *Id.* at 52, 396 F.2d at 933. The defendants pointed out that the plaintiff was able to file his action despite the fact that the records had not been released. *Id.* at 57, 396 F.2d at 938. The court rejected that argument, although it said that it "will deserve careful attention on remand," because the plaintiff's conduct must be "viewed in the totality of all circumstances." *Id.*

Second, the appellees' argument is not supported by this record. As discussed below, the record cannot be construed to establish as a matter of law that prior to September 1986, Diamond knew that his attorneys at McGuire, Woods had been less than candid with him regarding the extent of their potential conflict with the Reynoldses' interest. Thus, the record does not establish that Diamond had actual knowledge of wrongdoing on the part of the appellees at that time.

define some critical terms. Common to both approaches are the ideas that (1) the statute of limitations in cases such as this begins to run when a plaintiff either has actual knowledge of a cause of action or is for some reason charged with knowledge of that cause of action; (2) a plaintiff has some duty to investigate to determine possible causes of action; and (3) if a plaintiff has not acquired actual knowledge of a cause of action only because of his failure to meet that duty to investigate, the plaintiff is nevertheless charged with that knowledge. The parties do not agree on (a) the level of actual or chargeable knowledge required to begin the running of the statute of limitations; or (b) the scope of the duty to investigate, which is sometimes expressed in two segments: (i) the quantum of knowledge required to trigger the duty to investigate, and (ii) the amount of diligence that must be exercised in conducting the investigation once it is triggered.

 For the sake of clarity, we use the term "notice" to refer to the quantum of knowledge required to commence the running of the statute of limitations in a particular case. There are two types of notice: "actual notice" is that notice which a plaintiff actually possesses; "inquiry notice" is that notice which a plaintiff would have possessed after due investigation. Cf. *Clay Properties v. Washington Post Co.,* 604 A.2d 890, 895 (D.C.1992) (en banc) (defining terms in context of buyer's knowledge of preexisting interest in real property). As we use the term, inquiry notice does not refer to the amount of information that triggers a duty to investigate, as suggested by *Riddell,* which we consider to be confusing. We prefer to place the term "inquiry notice" in parallel with "actual notice," with both referring to the notice that starts the running of the statute of limitations. Thus, as we use the terms, in a given case, both actual notice and inquiry notice of a cause of action are acquired by a plaintiff at a particular time; at what time either exists is a question of fact. Once either actual or inquiry notice is present, however, the statute of limitations begins to run as a matter of law.

 Under settled authority binding on this division, a plaintiff alleging fraudulent conduct by the defendant has a duty at all times to investigate matters affecting her affairs in a manner that is reasonable under the circumstances. The standard articulated in *Riddell,* requiring "something closer to actual notice," has not, however, been addressed in any decision binding upon us, and we consider it on its merits. We decline to adopt the standard in *Riddell* as inconsistent with decisions that are binding upon us and the policies that motivate our accrual rules. We conclude instead that what constitutes notice of a cause of action for accrual purposes in cases such as this involving fraud, is the same as that which obtains in nonfraud cases, *see Knight, supra* note 4; *Bussineau, supra.* In all cases to which the discovery rule applies the inquiry is highly fact-bound and requires an evaluation of all of the plaintiff's circumstances.

## A.

### The Discovery Rule and Inquiry Notice

A review of the cases from this jurisdiction binding upon us demonstrates that a cause of action accrues for purposes of the statute of limitations when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice. What is "reasonable under the circumstances" is a highly factual analysis. The relevant circumstances include, but are not limited to, the conduct and misrepresentations of the defendant, and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations. Under our cases, the relevant facts may be such that it may be reasonable to conduct no investigation at all. Thus, whether an exhaustive investigation would have uncovered the claim is not necessarily relevant, unless the only reasonable investigation under the circumstances would have been an exhaustive one.

The first reported case in which a court of this jurisdiction applied a tolling rule was

*Moses v. Taylor*, 17 D.C. (6 Mackey) 255 (1888). In *Moses*, the plaintiff had lent the defendant certain bonds issued by the District of Columbia, so that the defendant could use them as collateral in obtaining another loan. *Id.* at 264. The defendant sold the bonds and retained the proceeds. *Id.* Although the lawsuit was filed after the statute of limitations had expired if counted from the time of the sale, it would be timely filed if the statute of limitations began to run when the plaintiff learned of the sale. *Id.* at 269, 279. The court held:

> It is sufficient for us to say . . . that while there is a conflict of authorities among the States, the Supreme Court has sufficiently stated its opinion that in the federal courts, either at law or in equity, [the plaintiff's tolling argument] is a valid [response] to the plea of the Statute of Limitations; that is to say, it holds it to be a good answer that the plaintiff did not bring his action sooner because the accruing of the cause of action had been concealed from him fraudulently by the defendant and therefore the statute ought not to run against him, except from the discovery of the wrong.

*Id.* at 281.

The opinion does not cite the Supreme Court authority to which it alludes; however, in the reported argument of counsel, the plaintiff relied upon a line of cases starting with *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1875). In *Bailey*, the Court described the doctrine of tolling for fraud as "the proposition that where the party injured by the fraud remains in ignorance of it without any *fault or want of diligence or care* on his part, the bar of the statute does not begin to run until the fraud is discovered." *Id.* at 348 (emphasis added). The Court held that the rule applied to cases in both law and in equity,[9] reasoning that statutes of limitations were enacted to prevent frauds; to prevent parties from asserting rights after the

lapse of time had destroyed or impaired the evidence which would show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.

*Id.* at 349.

In the same year that *Moses* was decided, the Supreme Court of the District of Columbia, in *Jackson v. Combs*, 18 D.C. (7 Mackey) 608 (1888), rejected a plaintiff's attempt to invoke the tolling rule. In *Jackson*, the plaintiff's assignor had assisted the defendant in pressing a claim for compensation against the United States. *Id.* Prior to a final decision, the defendant expressed a desire to switch representatives. *Id.* at 609. Because the defendant had agreed to a contingency arrangement, the defendant agreed to compensate plaintiff's assignor by giving him a note payable upon the defendant's receiving compensation from the government. *Id.* The defendant's claim was ultimately allowed; however, the plaintiff did not learn of that fact until after the limitations period had run. *Id.* at 610. The court held that because the instrument imposed upon its maker no duty to inform the creditor of satisfaction of the condition precedent, and the note maker employed no artifice or misrepresentation to conceal the cause of action, there was no tolling of the statute of limitations. *Id.* at 612–13. Although not so explained in the opinion, the rationale appears to be that the plaintiff had no reasonable basis to rely on the maker to inform him of his cause of action; thus, as a matter of law, the plaintiff did not exercise reasonable diligence in protecting his rights. *Id.*

9. There was during the nineteenth century some controversy over whether tolling for fraud or fraudulent concealment could apply in actions at law, as the doctrine originated in the English courts of equity, which had held that statutes of limitations do not apply to equitable actions. *See, e.g., Sherwood v. Sutton*, 21 F.Cas. 1303 (C.C.D.N.H.1828) (No. 12,782) (discussing at length pertinent English and American authorities). We have explained that the word "accrue" as used in our statute of limitations is left undefined and therefore is a subject for judicial interpretation. D.C.Code § 12–301 (1989); *Farris v. Compton*, 652 A.2d 49, 54, 62 (D.C.1994); *Ehrenhaft, supra*, 483 A.2d at 1198, 1201.

Soon after *Moses* and *Jackson,* the United States Supreme Court issued a decision in an appeal from an equitable decree of the Supreme Court of the District of Columbia in which the Court addressed the diligence required of a plaintiff in a fraud action, where the defendant contends that the suit is untimely. *Kilbourn v. Sunderland,* 130 U.S. 505, 518–19, 9 S.Ct. 594, 598, 32 L.Ed. 1005 (1889). The plaintiffs in *Kilbourn* contended that the defendants, their agents for the purchase of real estate, had failed to disclose their interest in certain property the plaintiffs had purchased through the defendants. In addressing the defendants' contention that the suit was barred by laches and the statute of limitations, the Court said:

> Reasonable diligence is of course essential to invoking the activity of the court, but what constitutes such diligence depends upon the facts of the particular case. Where a party injured by fraud is in ignorance of its existence, the duty to commence proceedings arises only upon discovery.... We hold that the complainants moved with sufficient promptness upon discovering the fraud, and that although, reposing confidence in their agents, they may have neglected availing themselves of some source of knowledge they might have sought, the defendants cannot be allowed to say that complainants ought to have suspected them, and are chargeable with what they might

have found out upon inquiry aroused by such suspicion.

*Id.*

Thus, the Court expressly considered the question of reasonable diligence to turn on the facts of the particular case, including the confidence reposed by the plaintiff in the defendant.

The next reported appellate case applying the discovery rule is *Lewis v. Denison,* 2 App.D.C. 387 (1894). Like *Kilbourn, Lewis* concerned a real estate agent who breached his duty of loyalty to the plaintiff. *Id.* at 388. The agent had secretly represented both the plaintiff as seller and a third party as buyer in a transaction. *Id.* at 388–89. The defendant agent told the buyer that the plaintiff seller had agreed to a high price while telling the seller that the buyer had agreed to a low price. The real estate agent in fact pocketed the difference. *Id.*

In *Lewis,* the Court of Appeals for the District of Columbia was more precise in explaining the scope of the plaintiff's duty than the Supreme Court of the District of Columbia had been in *Moses* and *Jackson.* In reversing judgment as a matter of law for the defendant on statute of limitations grounds, the court said that "the bar of the statute of limitations will not commence to run in equity until the fraud has been discovered, or until such time as by the use of ordinary care it might reasonably have been discovered." *Id.* at 391. The court further explained that the plaintiff bore the burden [10]

10. Because the issue of the burden of proof was not briefed by the parties and is not necessary to our decision, we express no opinion on the correct allocation of the burdens of production and persuasion. We note, however that several decisions of the D.C. Circuit have assigned to the defendant the burden of proof regarding the plaintiff's diligence. *Riddell, supra,* 275 U.S.App. D.C. at 373, 866 F.2d at 1491; *Hobson, supra,* 237 U.S.App.D.C. at 255 n. 113, 737 F.2d at 37 n. 113; *Richards v. Mileski,* 213 U.S.App.D.C. 220, 226, 662 F.2d 65, 71 (1981). The *Hobson* court assigned the burden of proof to the party with the burden of pleading the matter. 237 U.S.App.D.C. at 255 n. 113, 737 F.2d at 37 n. 113 ("Because the District of Columbia characterizes due diligence as a defense [to a claim of fraudulent concealment], the burden of proof on that issue squarely rests with defendants, and the same analysis applies as under the federal doctrine."). The court in *Hobson* relied upon *Estate of Chappelle v. Sanders,* 442 A.2d 157 (D.C.1982),

for its statement regarding District law. The question of burden of proof (or pleading, for that matter) was not at issue in *Estate of Chappelle,* however. Moreover, although the general rule may be that the party that asserts or pleads an issue must prove it, *see Gilles v. Ware,* 615 A.2d 533, 551 (D.C.1992) (Wagner, J., concurring) (citing cases), there are exceptions. *See Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1249–50 (D.C.1990) (assigning burden of proof to defendant where defendant sought to avail itself of exception to remedial statute upon which plaintiff's claim was based and facts were likely to be within defendant's knowledge). In addition, the principal purpose of the rules assigning the burden of pleading is to give the opposing party fair notice that a matter is in issue. *See* 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202, at 68–69 (2d ed. 1990) (discussing Fed.R.Civ.Proc. 8(a), which governs pleading of claims for relief);

of showing that (1) the defendant kept the fraud concealed, or the fraud was self-concealing; (2) the plaintiff did not discover the fraud within the limitations period; (3) the plaintiff did not "discover any facts sufficient to put him upon inquiry, which if followed with ordinary diligence would have led to its discovery" within the limitations period. *Id.* at 393.

In *P.H. Sheehy Co. v. Eastern Importing & Manufacturing Co.*, 44 App.D.C. 107 (1915), the court again applied the discovery rule, this time to what we later explained was a "constructive fraud." *Poole v. Terminix Co.*, 84 A.2d 699 (D.C.Mun.App.1951) (rejecting tolling in action for breach of implied warranty), *aff'd*, 91 U.S.App.D.C. 287, 200 F.2d 746 (1952), *receded from in Ehrenhaft, supra,* 483 A.2d at 1203 n. 17 (adopting discovery rule for contract and negligence actions). *But see Adrian v. American Security & Trust Co.*, 211 A.2d 771 (D.C.1965) (rejecting claim of "constructive fraud" where bank merely negligently cashed unendorsed treasurer's check payable to plaintiff). In *P.H. Sheehy*, the claimant, a wholesale grocer, complained that canned sardines it bought from the respondent were below the quality of the agreed exemplar. The claimant had not, however, discovered the poor quality until it received complaints from the retailers to which it subsequently sold the sardines. The suit would be untimely if the statute of limitations were to run from receipt of the sardines, but timely if the statute of limitations began to run from the retailers' complaints.

The court said that under those facts, "[t]he cause should have been submitted to the jury, with an instruction to the effect that the statute of limitations only began to run from the time when plaintiff, by the exercise of ordinary diligence under all the circumstances of the case, ought to have ascertained the fact of the breach of the warranty." 44 App.D.C. at 112. The court reasoned, "It cannot be said that a person should assert a right before he has knowledge of, or is chargeable with knowledge of, the [right]." The court explained that the claimant "must ordinarily have had such opportunity to ascertain his position as would be sufficient in the case of a man of ordinary intelligence and prudence under the circumstances of the case. He must be diligent in informing himself upon the true state of affairs, *culpable ignorance* being offensive both in equity and at law." *Id.* (emphasis added).

In cases binding on us, courts have repeated the ordinary, reasonable or due diligence standard first suggested by *Moses* and *Jackson* and then refined in *Lewis* and *P.H. Sheehy.*[11] *Estate of Chappelle v. Sanders*, 442 A.2d 157, 158 (D.C.1982); *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1193 (D.C.1980); *Weisberg, supra*, 390 A.2d at 996; *King, supra* note 4, 391 A.2d at 1186; *Maddox v. Andy's Refrigeration & Motor Serv. Co.*, 160 A.2d 799, 800 (D.C.1960); *White v. Piano Mart, Inc.*, 110 A.2d 542, 543 (D.C.1955); *Poole, supra*, 84 A.2d at 700; *Kraft v. Lowe*, 77 A.2d 554, 557–58 (D.C. 1950); *Emmett, supra* note 8, 130 U.S.App. D.C. at 57, 396 F.2d at 938; *Wiren v. Paramount Pictures*, 92 U.S.App.D.C. 347, 348–49, 206 F.2d 465, 466–67 (1953). We have expressed the diligence standard in the same terms in the non-fraud cases to which we have held the discovery rule applicable. *E.g., Ehrenhaft, supra*, 483 A.2d at 1202; *Burns v. Bell*, 409 A.2d 614, 617 (D.C.1979).

Thus, decisions binding on us hold that a plaintiff guilty of ordinary negligence in not

*id.* § 1270, at 414 (discussing Fed.R.Civ.Proc. 8(c), which governs pleading of certain defenses). The allocation of the burdens of producing evidence and persuading the trier of fact turns on considerations different from who should give notice that a matter is in issue. *See Riggs, supra,* 581 A.2d at 1249–50.

11. We note that these decisions vary slightly in their phrasing. In particular, some cases use the phrase "should have discovered" while others express it as "could have discovered." We think that the distinction is immaterial and the meaning intended the same in all the cases—to denote probable futurity resulting from a hypothetical act occurring in the past. In other words, both expressions are meant to refer to what likely *would* have been discovered had the plaintiff in fact exercised reasonable diligence under the circumstances. In this sense, the phrases merely express the requirement of causation—that is, the proposition that but for the plaintiff's want of reasonable diligence, she would have learned of her cause of action.

earlier discovering a cause of action may not avoid the bar of the statute of limitations merely because a fraud or fraudulent concealment is involved. *See Doolin v. Environmental Power Ltd.*, 360 A.2d 493, 497 (D.C. 1976) (holding that because alleged fraud related only to the legal interpretation of terms of a document conveying interest in land, the "alleged misrepresentation, in the exercise of due diligence, should have been ascertained at th[e] time" of the alleged fraud); *Maddox, supra*, 160 A.2d at 800 ("[F]raud … is not discovered when one's prior knowledge is confirmed as correct by another."); *cf. Brown v. Lamb*, 134 U.S.App.D.C. 314, 316 & n. 4, 414 F.2d 1210, 1212 & n. 4 (1969) (holding that there could be no tolling because "[n]o person … could reasonably rely on the representations allegedly made by or on behalf of" the defendants). For example, in *District–Florida Corp. v. Penny*, 62 App. D.C. 268, 269, 66 F.2d 794, 795 (1933), the court held that the plaintiff, who alleged he had been defrauded in a land transaction, was, as matter of law, on notice of the fraud because the information showing the fraud was available in the public land records at the time of the purchase. Under our prior decisions, the presence of a fraudulent misrepresentation does not excuse the injured party from acting reasonably to protect her interests.

In evaluating the reasonableness of the plaintiff's diligence, cases from this jurisdiction have long taken into account the confidential or fiducial relationship between the plaintiff and defendant. *See Kilbourn, supra*, 130 U.S. at 518–19, 9 S.Ct. at 598 ("although, reposing confidence in their agents, [the complainants] may have neglected availing themselves of some source of knowledge …, the defendants cannot be allowed to say that complainants ought to have suspected them, and are chargeable with what they might have found out upon inquiry aroused by such suspicion"); *Emmett, supra* note 8, 130 U.S.App.D.C. at 55–57, 396 F.2d at 936–38 (holding that hospital's improper refusal to release records to patient's next of kin may toll statute); *Searl v. Earll*, 95 U.S.App. D.C. 151, 156, 221 F.2d 24, 28–29 (1954) (holding that loan broker working on commission owed fiducial duty to borrower and

therefore committed fraud by failing to disclose that lender was broker's wife); *Young v. Howard*, 73 App.D.C. 340, 341, 120 F.2d 712, 713 (1941) ("The trustees [of a deed of trust securing a note held by the Bank] owed the Bank the continuing obligation of keeping it informed of action upon their part that would prejudice its rights."). In evaluating the plaintiff's diligence, we have also taken into account deceptive actions on the part of the defendant, regardless of disclosures actually made. *See William J. Davis, Inc., supra*, 412 A.2d at 1193 (holding that information on plaintiff's pay stub did not place plaintiff on notice of wage claim in light of "positive steps" defendant employer took to lull and conceal cause of action from plaintiff).

In none of those cases, however, did the court find it necessary to articulate a standard greater than negligence as part of the discovery rule that applies in actions where the cause of action has been concealed from the plaintiff by some wrongful conduct. Diamond, however, contends that we should adopt a rule that appears to demand less than reasonable care from the plaintiff where the plaintiff has been the victim of fraud. In the next section, we reject his suggestion.

**B.**

**The "Heightened Notice" Standard (or "Something Closer to Actual Notice")**

To support his contention that the standard of care imposed upon a plaintiff is lessened where the defendant is guilty of an act of fraud, Diamond points us principally to *Riddell, supra*, 275 U.S.App.D.C. at 373, 866 F.2d at 1491. *Riddell* involved both federal and D.C. law and treated the two as identical. "The elements of fraudulent concealment [for tolling purposes] are the same, moreover (at least insofar as relevant to the facts of this case), in both federal and District of Columbia law." *Id.* The court in *Riddell* contrasted "mere inquiry notice," which it said was sufficient to start the statute of limitations in the absence of fraud, with the amount of information required to trigger the plaintiff's duty of diligence where

there is such fraud, which it characterized as "something closer to actual notice." *Id.* *Riddell* was incorrect as to District of Columbia law, as discussed in the previous section, and we find unpersuasive its application of federal law.

The *Riddell* court relied on its decision in *Hobson, supra,* 237 U.S.App.D.C. at 253, 737 F.2d at 35. *Hobson* does not, however, stand for the proposition stated in *Riddell.* The court in *Hobson* did not address the plaintiffs' exercise of due diligence, but relied on the jury's finding that the plaintiffs did not fail to exercise due diligence. *Hobson,* 237 U.S.App.D.C. at 253, 737 F.2d at 35. The *Hobson* court rejected whatever challenge there was to the sufficiency of the evidence concerning due diligence, stating,

When a plaintiff receives information sufficient to put him on inquiry notice, the statute of limitations will begin to run if the plaintiff does not reasonably exercise due diligence in conducting the inquiry. In other words, he is held to be on notice of all facts he could have learned through reasonably diligent inquiry. In this case, defendants, who had the burden of proving plaintiffs' lack of due diligence, offered no evidence of what plaintiffs could have done to find out more about their claims, short of filing suit. As a result, the motions for directed verdict were properly denied if based on the plaintiffs' failure of diligence, and the jury's ruling is clearly reasonable.

*Id.* at 253 n. 107, 737 F.2d at 35 n. 107.

Instead, the *Hobson* court addressed what it termed a proposition "often overlooked": "The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Id.* at 253, 737 F.2d at 35.

The *Hobson* court discussed the evidence that it held showed as a matter of law that some of the plaintiffs had notice of their cause of action. In each case, the court based its decision on evidence of what the plaintiff actually knew, not what he should have known. *Id.* at 258, 737 F.2d at 40. The plaintiffs were held to have actual notice of the cause of action, in the sense that they actually knew facts sufficient to require them

to bring their action. In the face of such actual notice, the doctrine of fraudulent concealment "d[id] not come into play" to toll the statute of limitations. *Id.* at 253, 737 F.2d at 35.

*Hobson,* in other words, does not provide a foundation for *Riddell's* change in the discovery rule standard for cases involving fraud or fraudulent concealment. Thus, we turn to the reasoning in *Riddell.*

*Riddell* attempted to justify its "more stringent standard" in the following passage:

The fraudulent concealment by its nature makes discovery of the true facts more difficult, in part because it obscures the significance of such information as comes to plaintiff's attention. Furthermore, the concealing defendant lacks the equity to command easier access to the defense, especially in view of the inherent evidentiary difficulty of determining whether particular but isolated facts should have put the plaintiff on inquiry notice of his claim.

*Riddell, supra,* 275 U.S.App.D.C. at 373, 866 F.2d at 1491.

Thus, *Riddell* proffers three grounds on which to lessen the plaintiff's duty of care: first, that the defendant's actions have made the plaintiff's task more difficult; second, that the defendant "lacks the equity" to benefit from his misconduct; third, that it is difficult to ascertain the reasonableness of plaintiff's conduct where the facts are murky or disjointed. We do not consider that these grounds justify departing from the long-used and workable discovery rule standard in favor of adopting a new "something closer to actual notice" standard.

That a defendant's actions obscured the relevant facts from a plaintiff is more appropriately taken into account as part of the circumstances to be considered in examining the reasonableness of the plaintiff's diligence. As we have noted in non-fraud cases to which we have applied the discovery rule, a factor to be considered in the discovery analysis is the plaintiff's *reliance* on the defendant's expertise. *Ehrenhaft,* 483 A.2d at 1202; *Burns, supra,* 409 A.2d at 617. As discussed above, we believe similar considerations come into play in fraud cases. *See e.g. Kilbourn,*

*supra* 130 U.S. at 519, 9 S.Ct. at 598. The degree of reasonable reliance is likely to vary greatly from case to case. For example, where the plaintiff and defendant had been in a close, confidential relationship, the degree of reasonable reliance is likely to be much greater—and the reasonable diligence on the part of the plaintiff much less—than would exist where the parties had been in an adversary relationship.[12] The *Riddell* rule would obliterate the authority of the finder of fact to weight those distinctions. Therefore, we think the better approach is to permit the finder of fact to proceed on a case-by-case basis. *Cf. Brown v. Brown,* 524 A.2d 1184, 1188 (D.C.1987) (rejecting rule that changed "strength" of a presumption based on certain factors and instead holding that presumption shifted burden of persuasion, while factors were ones appropriate for the fact-finder to weigh); *Washington Metro. Area Transit Auth. v. Ward,* 433 A.2d 1072, 1074 (D.C. 1981) (Ferren, J., concurring) (advocating a single standard of reasonable care by landowners with respect to all entrants, regardless of the entrant's status as licensee, invitee or trespasser, "keeping in mind that the foreseeability of the entrant's presence bears on the question whether the landowner acted with 'reasonable care' ").

*Riddell*'s second policy argument is based on the defendants' "lack of equity." This court, however, has implicitly rejected the suggestion that the purpose of the tolling rule is to redress misconduct; the culpability of the defendant is immaterial. *See Keener v. Walker,* 256 A.2d 779, 781 (D.C.1969) (holding that even innocent misrepresentation, which was all that was alleged, could toll statute); *Hodde v. Chaney,* 139 A.2d 510, 512 (D.C.Mun.App.1958) (holding that action based on innocent misrepresentation tolled statute until discovery of defendant's mistake). Indeed, in *P.H. Sheehy, supra,* the emphasis was on the rights of the plaintiff who acts reasonably, not on the misconduct of the defendant:

> It cannot be said that a person should assert a right before he has knowledge of, or is chargeable with knowledge of, the same. He must ordinarily have had such opportunity to ascertain his position as would be sufficient in the case of a man of ordinary intelligence and prudence under the circumstances of the case.

44 App.D.C. at 111. *But cf. Peyser v. Owen,* 73 App.D.C. 64, 65, 116 F.2d 298 (1940) (affirming dismissal of complaint as to negligent bank directors, where complaint did not allege that the appellee directors had profited from or concealed predecessor directors' fraud the appellee directors' negligently failed to detect).

We think that a focus on the plaintiff's diligence, rather than on the defendant's misconduct, is more appropriate given the purpose of statutes of limitation to protect defendants from stale claims—whether they be for fraud or other breaches of duty. In cases not involving fraud, we have emphasized balancing the right of the plaintiff to a remedy against the right of the defendant to be free of stale claims. *Farris, supra* note 9, 652 A.2d at 59, *Ehrenhaft, supra,* 483 A.2d at 1202; *Burns, supra,* 409 A.2d at 616. Because we strike a balance between plaintiff's and defendant's interests whether the case involves fraud or not, there should not be any distinction in the standard of diligence required in either case. The passage of time makes it just as difficult for the defendant to prove the plaintiff's knowledge and lack of

---

12. Although it concerns reasonable diligence in a somewhat different context, our en banc decision in *Clay Properties, supra,* 604 A.2d 890, is instructive. In *Clay Properties,* the purchaser of a building contended that it had acquired its fee simple interest free of an unrecorded prior master lease on the building. *Id.* at 891. We reversed summary judgment in favor of the purchaser, holding that the finder of fact could find the purchaser had inquiry notice because the purchaser had previously entered into a lease agreement with the master leaseholder, which was not the owner of record. *Id.* at 897. We reasoned that "[b]ecause the possibility of [the prior master lease] interest is inconsistent with a perfect right in him who proposes to sell, it cannot be said, without more, that a buyer of ordinary prudence would not inquire further to determine the nature of that interest." *Id.* (internal quotations and citations omitted). Thus, a purchaser cannot, as a matter of law, rely solely upon the representations of the seller concerning title, and expect its rights vis-à-vis third parties to be protected. Nevertheless, whether in particular circumstances the purchaser has acted reasonably and what would have been discovered had a reasonable inquiry been made are usually questions of fact. *See id.* at 899 & n. 23.

diligence in bringing a claim as it does to disprove meritless allegations. We do not think it appropriate to protect those careless of their rights at the expense of the right of the party accused to defend herself.

The final ground offered by *Riddell*—that the reasonableness inquiry is too difficult where fraud is present—is not persuasive. We daily entrust to judge and jury the task of assessing the bounds of reasonable conduct in every manner of human endeavor. If, as is increasingly the case, the area is one beyond the ken of the average juror (or judge), then the parties must produce expert evidence to assist them in understanding the field. We think that there is no material distinction where the question is whether a plaintiff were reasonable in her investigation of matters affecting her affairs. Moreover, to the extent the *Riddell* court was concerned with the evidentiary difficulties posed to the parties, its concern was misplaced. The plaintiff is well-situated to discourse upon the scope of her knowledge concerning her cause of action; the defendant will likely prefer to litigate what the plaintiff *should* have known, as well as what the plaintiff *did* know, regardless of the evidentiary difficulties posed by the counterfactual inquiry. Finally, it is not clear why the presence of fraud would make the hypothetical inquiry significantly more difficult than it is in other cases to which the discovery rule applies. Consequently, we reject the "it's too hard" rationale as well.

## C.

### The Ingredients of Notice

Up to this point we have not addressed what constitutes knowledge of a "cause of action." Because prior decisions state the discovery rule with actual and inquiry notice in parallel—"knew *or* should have known"— it is clear that the facts sufficient to constitute knowledge of a cause of action are the same whether we are concerned with actual or inquiry notice. No case binding upon us, however, explicitly addresses in the context of an action involving fraud or fraudulent concealment what facts are sufficient to constitute such knowledge.

In cases not involving fraud, we have addressed those facts that are legally sufficient to put the plaintiff on notice and start the period of limitations running. In *Bussineau, supra,* 518 A.2d at 425, we said that there were three elements to the requisite knowledge: (1) an injury; (2) its cause in fact; and (3) some evidence of wrongdoing. We noted that the discovery rule applies where "the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs." *Id.* But see *Farris, supra* note 9, 652 A.2d at 55 (reversing dismissal on statute of limitations grounds where plaintiff alleged she had repressed memory of defendant's sexual battery during her minority, while noting that there was no allegation that plaintiff did not know of abuse or its wrongfulness at the time of its occurrence). We observed that in many cases, knowledge of the cause in fact of an injury will be tantamount to knowledge of tortious conduct. *Bussineau, supra,* 518 A.2d at 426. We also said, however, that there are

> more difficult cases ... where the injury and cause-in-fact do not themselves provide evidence of negligence. This is particularly so when the professional reassures the lay client or patient that all is well and that things are proceeding as they should.

*Id.*

In holding that knowledge of wrongdoing was required, we cited two considerations: (1) it is inconsistent with notions of justice to interpret accrual to occur before the plaintiff would reasonably know of any wrongdoing, *id.* at 428, and (2) an accrual rule that did not require knowledge of wrongdoing would encourage the filing of unfounded claims by plaintiffs seeking to protect their unknown rights. *Id.* at 431.

Although *Bussineau* was a medical malpractice action, we have since held that the quantum of knowledge required to trigger accrual is the same in legal malpractice cases. *Knight, supra* note 4, 553 A.2d at 1234. *Bussineau* itself noted that we had required knowledge of wrongdoing in a case involving tort and contract claims. *Bussineau, supra,* 518 A.2d at 428 (citing *Ehrenhaft, supra,* 483 A.2d at 1202). We think

that the reasoning of *Bussineau*, as interpreted and applied in subsequent cases has equal force in the context of fraud claims, where the relationship between the fact of injury and the tortious conduct may similarly be obscured, requiring, in addition, "some evidence of wrongdoing." *Id.* Hence, we hold that the same knowledge requirement we have adopted in malpractice actions applies in cases involving fraud.

■ That holding does not end the matter, for the standard of "some evidence of wrongdoing" is far from a precise one. In this case, there remains one question regarding the requisite quantum of knowledge that must be resolved before we undertake to apply the law to the facts of this case: whether a plaintiff's knowledge of misconduct by one alleged coconspirator places the plaintiff on notice of claims against the other coconspirator. As we have not addressed that issue, we look for guidance from the United States Court of Appeals for the D.C. Circuit. In *Fitzgerald v. Seamans*, 180 U.S.App.D.C. 75, 84, 553 F.2d 220, 229 (D.C.Cir.1977), and *Richards, supra* note 10, 213 U.S.App.D.C. at 224–25, 662 F.2d at 69, the court held that the plaintiff's knowledge of wrongdoing on the part of one defendant did not cause accrual of his action against another, unknown defendant responsible for the same harm, unless the two defendants were closely connected, such as in a superior-subordinate relationship.[13]

We adopt the Circuit's approach with the understanding that whether the relationship of the defendants is sufficiently close to cause accrual should generally be considered as a question of fact which may be imputed to the plaintiff by the same standard of reasonable diligence under the circumstances. In some circumstances, however, the relationship of the defendants, together with other facts, may establish as a matter of law that a reasonable plaintiff with knowledge of the misconduct of one would have conducted an investigation as to the other. If that investigation would, as a matter of law, have revealed some evidence of wrongdoing on the part of the other defendant, then the cause of action will have accrued as to both.[14]

## D.

### A Single Standard for All Discovery Rule Cases

We have in the past suggested that the discovery rule in cases involving fraud and fraudulent concealment is the same as in other cases to which a discovery rule ap-

**13.** Although the court in *Fitzgerald* was applying the discovery rule to a federal civil rights claim, we find persuasive the court's reasoning on accrual:

> Read into every federal statute of limitations, including the adoption of analogous local statute of limitations, is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit.

180 U.S.App.D.C. at 83, 553 F.2d at 228

**14.** We do not perceive any tension between our holding in *Estate of Chappelle, supra* note 10, 442 A.2d at 158, that a defendant's concealment merely of his identity does not toll the statute of limitations, and our holding today, that knowledge of wrongdoing on the part of one defendant does not as a matter of law result in accrual of the cause of action with respect to others guilty of wrongdoing in connection with the same transaction. *Estate of Chappelle* arose out of an automobile accident. Although the defendant driver gave a false name and address to the decedent before fleeing the scene, the plaintiff had information concerning the owner of the car. *Id.* at 157. We held that under those facts the statute was not tolled. *Id.* at 158. In *Estate of Chappelle*, the concealment of the mere identity of the defendant did not amount to concealment of wrongdoing on the part of the defendant. In *Fitzgerald* and *Richards*, however, not only were the defendants' identities concealed, but the fact of their participation in the wrongdoing as well. The material distinction is that in cases such as *Estate of Chappelle*, the plaintiff knew of the existence of all the defendants guilty of the wrongdoing as a result of the wrongful act. On the other hand, in cases such as *Fitzgerald* and *Richards*, where the plaintiff's injury is caused by the actions of several persons, and action on the part of some of those persons is not an apparently necessary cause of the plaintiff's injury, then knowledge of the wrongful conduct of fewer than all of the wrongdoers does not necessarily imply knowledge of all the wrongdoers. In such circumstances, it is not merely the *identity* of the unknown wrongdoers but their very *existence* that is concealed from the plaintiff.

plies.[15] *William J. Davis, Inc., supra,* 412 A.2d at 1193 & n. 16 (noting that application of fraud discovery rule accorded with that recently adopted for medical malpractice cases in *Burns, supra* ); *Weisberg, supra,* 390 A.2d at 996 n. 8 (noting that standard under discovery rule for malpractice cases is similar to that established in fraud cases). In light of the foregoing, we take this opportunity to state that the standard is in fact the same in all cases to which the discovery rule applies, regardless of the presence or absence of fraud, or the characterization of that fraud. In every case, the plaintiff has a duty to investigate matters affecting her affairs with reasonable diligence under all of the circumstances. Once the plaintiff actually knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then she is bound to file her cause of action within the applicable limitations period, measured from the date of her acquisition of the actual or imputed knowledge. Not only is this identity of standard compelled by the policies that underlie our accrual rules, but we hope that in many cases it will eliminate much complex and confusing litigation concerning the characterization of the parties' conduct in committing, concealing and investigating wrongdoing.

## III.

### Summary Judgment

When seeking summary judgment,

[t]he moving party bears the burden of clearly demonstrating the absence of a material factual dispute and entitlement to judgment as a matter of law. If the moving party meets its burden, it is incumbent upon the non-moving party to show that such an issue exists in order to defeat the motion. However, if the moving party does not meet its initial burden, summary judgment must be denied even where the opponent comes forth with nothing.

**15.** This court has extended the discovery rule to many classes of cases, including medical, legal and architectural malpractice actions and products liability actions where the injury is a latent disease, but has declined to declare the rule

*Sherman v. District of Columbia,* 653 A.2d 866, 869 (D.C.1995) (citations and internal quotations omitted).

We view the record in the light most favorable to the party opposing the motion. *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472 (D.C.1994) (en banc). On appeal, we conduct an independent review of the record applying the same standard as the trial court. *Id.; West End Tenants Ass'n v. George Washington Univ.,* 640 A.2d 718, 725 (D.C.1994); *see also Knight, supra* note 4, 553 A.2d at 1233 (reviewing summary judgment on statute of limitations issue); *Bussineau, supra,* 518 A.2d at 427 (same).

This is where I part company with both my colleagues, because I believe that, on this record, summary judgment was improper. First, the record reflects genuine issues of material fact; second, application of the discovery rule standard to the undisputed facts does not entitle defendants to judgment as a matter of law on statute of limitations grounds. Thus, I would reverse and remand to the trial court.

### A.

### The Facts of Record for Purposes of Summary Judgment

Construing the record in the light most favorable to Diamond, who opposes summary judgment, the following facts are deemed to be true for purposes of the summary judgment motion: [16]

1. In April 1983, Davis began to represent Diamond in the federal tax fraud matter.

2. In spring 1985, Davis told Diamond that he had done some tax work for David Reynolds.

3. No one at McGuire, Woods ever told Diamond that McGuire, Woods had long done extensive legal work for Reynolds Metals and the Reynolds family.

applicable in all cases. *Farris, supra* note 9, 652 A.2d at 54 (citing cases).

**16.** Most, if not all, of these "facts" are actually hotly disputed by defendants.

4. McGuire, Woods in fact had done extensive legal work for Reynolds Metals and the Reynolds family, including work for the company worth about a million dollars while the firm represented Diamond.

5. Davis believed that the fact that McGuire, Woods represented Reynolds Metals and the Reynolds family was material information that should have been disclosed to Diamond.

6. Harrison and Frydrychowski had reason to believe that the fact that McGuire, Woods represented Reynolds Metals and the Reynolds family was material information that should have been disclosed to Diamond.

7. Diamond had no knowledge of the true scope of McGuire, Woods's representation of Reynolds Metals and the Reynolds family until after September 1986.

8. Before September 1986, Diamond suspected Judge Merhige of participating in a conspiracy to convict him on criminal charges.

9. Diamond filed the present action against McGuire, Woods on September 19, 1989.

The appellees urge that the documents from Diamond's counsel's files show that it is undisputed that Diamond had knowledge of the potential conflict at a time earlier than September 1986. They point to the use of the term "Reynolds Metals" in Lytton's notes, as well as the term "represents" in both the notes and Diamond's October 1985 letter to Kohn and Prickett. Furthermore, they contend that the probate documents demonstrate that Diamond knew at the latest by March 1986 that McGuire, Woods's connection with the Reynolds family extended beyond Davis's doing David Reynolds' taxes. Although the appellees' arguments concerning interpretation of these documents are not without merit, for the following reasons I believe that they are more properly directed to the trier of fact.

In their brief on appeal, the appellees contended that "Lytton's notes show, and Diamond has not denied, that Diamond knew in mid 1984 that McGuire, Woods represented Reynolds Metals." That sentence contains three assertions, one concerning the scope of Diamond's knowledge, another concerning when he had the knowledge, and a third suggesting, indirectly, the source of that knowledge. I address each in turn.

Lytton's notes do not demonstrate as a matter of law that Diamond knew of McGuire, Woods's work for Reynolds Metals. Although Lytton acknowledged that the notes were in his handwriting, there is no testimony in the record that they accurately reflected what Diamond told him, or even that he made the notes during the course of the conversation. He did testify even after reviewing the notes that he could not recall the content of the conversation or when it took place. Given Diamond's sworn denial of the accuracy of the notes, I cannot hold that they are conclusive of the issue.

The contentions concerning the time of the conversation and the source of Diamond's knowledge of a potential conflict are interrelated. At oral argument, apparently recognizing that Diamond's affidavit in opposition to summary judgment did in fact deny the accuracy of the notes, the appellees contended instead that the affidavit was an impermissible attempt to contradict Diamond's earlier deposition testimony. The appellees urged that because Diamond said he learned from Davis of the tax representation of David Reynolds in the spring of 1985, Lytton's notes show Diamond must have had independent knowledge of McGuire, Woods' representation of the Reynolds family and its interests.[17]

That contention rests upon a critical inference from the evidence in the record: that Lytton's notes were of a telephone conversation that occurred in 1984. No one has testified to that fact, however. The notes themselves are undated. The appellees' only basis for dating the notes to 1984 is, at best, their relative location in a stack of documents some seven or eight years after the notes

---

17. This knowledge could not have come from McGuire, Woods, because Davis denied having ever made any disclosure to Diamond and Diamond was not introduced to the one McGuire Woods attorney who claims to have made any disclosure until Spring 1985.

were taken.[18] Balanced against that circumstantial evidence is the equally circumstantial evidence that Diamond testified that he learned of the tax representation in spring 1985. Although it may be fair, or even more than fair, to infer that the notes were in fact taken in 1984, I cannot say that this inference is required as a matter of law.

The appellees find significance in the fact that both Lytton's notes and Diamond's October 1985 letter used the term "rep" or "represents" in connection with Davis's and the law firm's relationship to "Reynolds." The trial court appears to have agreed, saying during oral argument on the summary judgment motion, "Represents doesn't sound to me like a couple of tax returns." Although I agree that the choice of words is not irrelevant, I cannot conclude that is it dispositive. In both the notes and the letter, the writer could have used the word "represent" or "rep" to mean either one limited matter or a broader-based professional relationship. What the word meant in this context is a question of fact. For example, we know from common experience that even attorneys who are responsible for a single matter speak of "representing" their client; the very word "attorney" implies acting in a representational capacity.[19] The record reflects that Diamond is himself a law school graduate and was licensed to practice law prior to his conviction for tax fraud. On this record, I cannot say that as a matter of law, Lytton's and Diamond's choice of words demonstrates that Diamond's knowledge extended beyond what he says he was told by Davis.

The documents from the 1971 probate of J. Sargeant Reynolds's will are similarly inconclusive. The age of the matter, its nature, and the de minimis amount of attorney fees evidenced by the documents render it debatable whether they should be perceived to contradict Davis' earlier disclosure. At best, the information in the documents and Diamond's knowledge of it are relevant to the determination by the trier of fact regarding the reasonableness of Diamond's diligence under the standard articulated in the previous section.

In short, in my view the record reflects a genuine issue of material fact as to whether Diamond actually knew of any wrongdoing on the part of his attorneys prior to November 1986.

### B.

### Applying the Discovery Rule to the Undisputed Facts

In my view, the undisputed facts do not warrant judgment in favor of the appellees as a matter of law on statute of limitations grounds. There is a genuine issue as to whether Diamond should, based on the undisputed facts of record, in the exercise of reasonable diligence under all of the circumstances, have conducted an investigation into the appellees' representation of Reynolds Metal earlier than November 1986. I cannot say as a matter of law that a reasonable person who had Diamond's suspicions of bias on the part of Judge Merhige and his knowledge of the professional connection between Judge Merhige and defendants would have conducted an investigation that would have led to discovery of wrongdoing on the part of the appellees to Diamond's detriment. The one bit of information concerning the connection between the appellees and Judge Merhige involved allegations of bias in favor of the appellees' client. See supra note 7. Moreover, the professional lawyer-client connection between the appellees and Judge Merhige is not one that was so close, nor one that was kept so secret, that knowledge of

18. Most of the documents in the stack appear to have been in chronological order, with the undated notes appearing between documents dated June 15, 1984 and August 9, 1984. However, there is no evidence in the record whether the relative location of the notes in the stack is the same as when they were filed and whether they were intended to be chronological.

19. The word "attorney" is derived from the past participle of the Middle French word "atorner," meaning to dispose or turn over. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 141 (1971). Thus, in its original sense, "attorney" meant simply a person to whom one gave responsibilities in the conduct of one's affairs; that is, one who stood in for, or represented, another. The word retains that meaning when used in the phrase, "attorney in fact." BLACK'S LAW DICTIONARY 129 (6th ed. 1990).

their mere association should trigger an investigation. On the other hand, Diamond had relied heavily on McGuire, Woods to represent his interests in an important criminal tax fraud proceeding.

I also cannot say, as a matter of law, that the undisputed fact that Diamond knew of apparently minor tax representations of a member of the Reynolds family by Davis should have triggered an investigation to discover a broader representation. In fact, the partial disclosure could fairly be viewed as cutting in favor of Diamond's diligence, in that he was entitled to rely upon that representation from his attorney until such time as he had good reason to believe that it was false.[20] I cannot say, as a matter of law, that Diamond had sufficiently good reason prior to November 1986 to question the accuracy of that statement.

I do not, of course, address the truth of Diamond's claims nor the probability of their success were the case to go to trial. In fact, I have only assumed without deciding that there is sufficient evidence to support a judgment in his favor on the merits of his claims. This court's decision must be based solely on the matters of record, including Diamond's affidavit in opposition to summary judgment. Because we must in the present posture accept the truth of the evidence of record,[21] I feel compelled to vote to reverse the grant of summary judgment on statute of limitations grounds.

KERN, Senior Judge, concurring:

I concur in the judgment affirming the trial court for the reasons set forth in Part I of Judge Ferren's lucid opinion, and I agree with and join in Part II of the persuasive opinion of Judge Ruiz setting forth the appropriate legal standard to be applied in the instant case.

FERREN, Associate Judge, concurring in the result and dissenting in part:

I concur in the judgment to affirm but dissent from the majority's formulation of the standard of notice that applies in a case of fraudulent concealment. The majority applies the traditional discovery rule in which the statute of limitations begins to run when the plaintiff has "inquiry notice" of the claim. I believe that when there is fraudulent concealment, as in this case, a higher standard of notice, called "heightened notice," is required before the statute begins to run. This higher standard is necessary to compensate for the fraud that masks the claim. Even applying this higher standard, however, I conclude that plaintiff-appellant, Patrick H. Diamond, had the required heightened notice more than three years before he filed suit, and that his claim is accordingly time barred.

## I.

Taking the record in the light most favorable to Diamond, I proceed from the premise that Diamond's attorneys in his tax fraud prosecution, appellees Carle E. Davis, Esq. and his law firm, McGuire, Woods, Battle & Boothe ("McGuire, Woods"), fraudulently concealed from Diamond—by failing to disclose—the firm's lawyer-client relationship with Reynolds Metals Co., which Diamond had sued for an alleged RICO violation. *See* 18 U.S.C. §§ 1961–1968 (1988). The question, then, applying the "discovery rule" used by the majority, is whether, despite fraudulent concealment, Diamond was on "inquiry

---

**20.** Diamond refers to the partial disclosure as a "lulling" statement. I decline to use that term, because it is in this context a term of art and would tend to confuse the statute of limitations analysis. In the context of tolling of a limitations period, "lulling" refers to a situation in which the plaintiff knows of his cause of action, but the defendant, by sufficiently reliable promises and other conduct, intends to induce the plaintiff not to commence an action until time has run. *See, e.g., Hornblower v. George Washington Univ.,* 31 App.D.C. 64, 75 (1908) (recognizing doctrine where plaintiff said he was induced not to file suit by defendant's agreement to arbitrate dispute, but declining to apply it where plaintiff had taken no steps to proceed to arbitration and defendant took no steps to prevent it, thus defeating any inference that defendant intended to lull the plaintiff into inaction); *see generally Interdonato v. Interdonato,* 521 A.2d 1124, 1135–36 (D.C.1987) (discussing equitable bases of rule and applying it to deny summary judgment).

**21.** Superior Court Rule of Civil Procedure 56(g) provides for severe sanctions against parties filing affidavits in bad faith or for purposes of delay.

notice" of his claims (all of which arose from the facts describing the alleged conspiracy) more than three years before he filed suit in September 1989. Specifically—according to the majority's formulation—because "the plaintiff has a duty to investigate matters affecting her [or his] affairs with reasonable diligence under all of the circumstances," did Diamond actually know, or, if he had exercised reasonable diligence would he have known, "of some injury, its cause-in-fact, and some evidence of wrongdoing" before the three-year statute of limitations expired? *Ante* at 381.

The conspiracy is premised on four sets of facts which, as I would summarize them, allegedly give rise to an inference of culpability:

1. Judge Robert H. Merhige had a close personal relationship with the family of J. Sargeant Reynolds, the family that founded and, under the leadership of David P. Reynolds, continues to head Reynolds Metals Co.

2. Davis and McGuire, Woods knew about the Merhige/Reynolds family relationship.

3. Davis, as attorney for the J. Sargeant Reynolds estate, had a relationship with Judge Merhige, who was an executor of that estate.

4. Davis and McGuire, Woods had a substantial connection with Reynolds Metals Co., as evidenced by the fact that Reynolds Metals was a firm client.

According to Diamond, the foregoing facts, buttressed by evidence proffered as to each, permit a reasonable inference that Davis and McGuire, Woods conspired with members of the Reynolds family and with Judge Merhige to sell out the firm's client, Diamond, by obtaining Diamond's conviction at his bench trial for tax fraud before Judge Merhige (which the firm facilitated by advising Diamond to waive a jury), in order to besmirch Diamond's credibility and thereby help Reynolds Metals prevail in Diamond's—now a felon's—RICO lawsuit against that company.

Diamond does not effectively deny that he was aware more than three years before he filed suit (in September 1989) of the first set of facts shaping the alleged conspiracy. In particular, as to the Merhige/Reynolds relationship, Diamond wrote a letter on October 7, 1985, to his attorney in the RICO litigation, Harold Kohn, Esq., that he was concerned about Judge Merhige's bias against him fueled by "Reynolds," implying knowledge of a relationship between the judge and the Reynolds family. Diamond's knowledge was made unquestionably clear several months later in a letter of March 21, 1986 to attorney Kohn and his partner, William Prickett, Esq., in which Diamond wrote that Judge Merhige had been a friend of J. Sargeant Reynolds and was an executor of J. Sargeant Reynolds' estate.

Nor does Diamond seriously contest his awareness, more than three years before he filed suit, of the second and third sets of facts critical to the alleged conspiracy: Davis's, and thus McGuire, Woods', knowledge of the Merhige/Reynolds family relationship, and Davis's relationship with Merhige. In Diamond's March 21, 1986 letter to attorneys Kohn and Prickett, he enclosed a copy of a receipt for payment of an inheritance tax installment showing that the address of the estate—of which Judge Merhige was an executor—was Mr. Richard S. Reynolds, Jr. c/o Carle E. Davis, Esq., a McGuire, Woods partner (and Diamond's lawyer). Other documents accompanying this letter show that the Reynolds estate, handled in part by Judge Merhige, paid legal fees to McGuire, Woods.

Accordingly, the only link in the alleged conspiracy that Diamond emphatically contends he was not aware of more than three years before he filed suit was Davis's and McGuire, Woods' connection with Reynolds Metals, a defendant in Diamond's Delaware RICO lawsuit. Diamond claims he did not know about this relationship until November 1986 (fewer than three years before he filed suit), when he discovered from an SEC filing that McGuire, Woods was representing Reynolds Metals in its takeover of Robertshaw.[1] In a nutshell, Diamond contends that

---

1. Diamond had been vice president of finance and a member of the board of directors of Ro-

bertshaw Controls Co., of which Reynolds Metals Co. held 30% of the stock. When Diamond ob-

McGuire, Woods—in particular Carle E. Davis, Esq., Diamond's attorney in the tax fraud case—had fraudulently concealed from him the McGuire, Woods/Reynolds Metals connection by failing to honor the fiduciary obligation to disclose that relationship to Diamond.

I conclude that the record strongly, if not conclusively, suggests that Diamond actually knew about the McGuire, Woods/Reynolds Metals relationship more than three years before he filed suit. But even if he did not, I also conclude that Diamond, in the exercise of required reasonable diligence, would have discovered this relationship that long ago. The record shows the following:

A. Sometime between June 15 and August 9, 1984, Diamond apparently told William Lytton, one of his Delaware lawyers, that Diamond was aware of a relationship between McGuire, Woods and "Reynolds Metals." [2] A portion of Lytton's notes from a telephone conversation with Diamond during that period says: "IRS problem. Carle Davis—Richmond VA McGuire, Woods, & Battle *(also rep. Reynolds Metals)* OK for us to talk to them." (Emphasis added.)

B. Diamond has attempted to refute this evidence, alleging he has created a genuine issue of material fact negating summary judgment, by supplying an affidavit on September 9, 1993 that includes the following statement:

> Early in that Delaware litigation William B. Lytton, an attorney in my Philadelphia law firm asked me the nature of the tax matter in Richmond, and asked me whether I was adequately represented in that matter. I responded that I thought I was well represented, and that my lawyer was Carle E. Davis of McGuire Woods, *who must know his tax stuff because he'd done [David] Reynolds' taxes ....* I frankly believe Mr. Lytton's notes to represent a misunderstanding in communication from

me to him. *I never told him that McGuire Woods represented Reynolds Metals ....* (Emphasis added.)

In short, Diamond contends that attorney Lytton misunderstood him, since Diamond merely had indicated to Lytton that McGuire, Woods attorney Davis had done David Reynolds' taxes.

C. The question, then, is whether this affidavit creates a genuine issue of material fact—precluding summary judgment—as to whether in 1984, or at least sometime more than three years before he filed suit, Diamond knew McGuire, Woods represented Reynolds Metals. As elaborated below, there are several pieces of record evidence that substantially undercut Diamond's denial of such knowledge. The following evidence may not assuredly show that Diamond knew of the McGuire, Woods/Reynolds Metals connection in 1984, as Lytton's notes ostensibly confirmed; but it does show—applying the "discovery rule"—that Diamond knew enough during 1984 and 1985 to achieve "inquiry notice" of his claims, through the exercise of reasonable diligence, more than three years before he filed suit.

*First,* in a deposition on August 21, 1990, Diamond testified that the first time he had learned of "any relationship" between Carle Davis and David Reynolds was in the spring of 1985. If that was true, Diamond has effectively undermined, under oath, the statement he made under oath in his affidavit three years later, on September 9, 1993, that, in his *1984* conversation with attorney Lytton, Diamond had been referring only to Davis's tax work for David Reynolds, not (as Lytton had recorded) to McGuire, Woods' representation of Reynolds Metals. If Diamond's 1990 deposition was true, his 1993 affidavit had to be false—or vice versa. Either way, in attempting to show a genuine issue of material fact, Diamond's repudiation

---

jected to Reynolds Metals' acquiring an additional 10% of Robertshaw's stock, Diamond was fired.

**2.** It is true, as Judge Ruiz points out, *ante* at 382 that Lytton's notes are not dated. They were found, however, in a chronologically organized stack of papers between a document dated June

15, 1984 and another dated August 9, 1984. Of compelling significance, Lytton testified that the conversation occurred between those two dates. Diamond himself, moreover, stated in his September 9, 1993 affidavit that the conversation on which Lytton's notes were based took place "early in that Delaware litigation." The Delaware suit was filed in May, 1984.

of Lytton's notes of the 1984 conversation is suspect.

*Second,* in the very September 9, 1993 affidavit in which he claims attorney Lytton misunderstood his reference to Reynolds during the 1984 conversation, Diamond also acknowledged that, in his mind, David Reynolds and Reynolds Metals were interchangeable:

> It is my recollection that I specified David Reynolds when I told Mr. Lytton of this [relationship between McGuire, Woods and Reynolds]. However, I must confess that for some time during that litigation there was a bad habit I—and to some extent my lawyers—had of referring to either or both simply as "Reynolds," *since in my mind, at least, Reynolds Metals was simply an extension of David Reynolds.* (Emphasis added.)

Thus, even if, in Diamond's 1984 conversation with attorney Lytton, Diamond had been referring only to Davis's handling of David Reynolds' taxes, Diamond's own affidavit indicates that Diamond would have known that this tax work for David Reynolds effectively reflected a relationship between Davis (and thus his firm McGuire, Woods) and the man (David P. Reynolds) who was Board Chairman of Reynolds Metals—a relationship presumably sympathetic with the fortunes of Reynolds Metals itself.

*Third,* in a letter of October 7, 1985 to attorney Kohn, Diamond not only expressed a concern about outside interference with his tax fraud trial before Judge Merhige by "Reynolds," but also identified his concern that McGuire, Woods' handling the appeal of Diamond's tax fraud conviction "might cause problems *for a firm* [McGuire, Woods] that has to deal with Merhige every day *and which represents Reynolds . . . .*" (Emphasis added.) This letter indicates that, in 1985,

Diamond was aware that Davis's firm (McGuire, Woods) "represent[ed] Reynolds," which implies Diamond's awareness of more than assistance by Carle Davis in preparing David Reynolds' tax returns. It implies, at the very least, that Diamond knew McGuire, Woods had an ongoing lawyer-client relationship with David P. Reynolds (Board Chairman of Reynolds Metals) and, very likely, with Reynolds Metals itself, which in Diamond's mind "was simply an extension of David Reynolds." [3]

*Finally,* Diamond has never made clear in any event why his knowledge of the McGuire, Woods/Reynolds Metals relationship was necessary to the alleged conspiracy, in light of his acknowledged awareness of the McGuire, Woods/David Reynolds connection. David P. Reynolds was Board Chairman of Reynolds Metals—a fact Diamond presumably knew (among other reasons) because Diamond had been financial vice president and a director of Robertshaw Controls Co., which Reynolds Metals Co. substantially owned. See *supra* note 1. Diamond acknowledged in his September 9, 1993 affidavit, moreover, that in his mind Reynolds Metals "was simply an extension of David Reynolds." Furthermore, Diamond's Delaware RICO suit named David P. Reynolds, as well as Reynolds Metals Co., as a defendant. Accordingly, even if Diamond learned about the McGuire, Woods/Reynolds Metals relationship less than three years before he filed suit, Diamond unquestionably knew, more than three years before he filed suit, enough facts about McGuire, Woods' connections with David P. Reynolds (and with Judge Merhige) to know that the law firm had a basis for pursuing its alleged conspiratorial aims on behalf of the Reynolds family without regard to any formal McGuire, Woods/Reynolds Metals connection. [4]

---

**3.** Judge RUIZ's argument that Diamond's use of the word "represents" in the letter to Kohn does not necessarily refer to anything more than Carle Davis's work on David Reynolds tax returns, see *ante* at 383, misses the point. Diamond was aware of a relationship between McGuire, Woods and "Reynolds" that would make it problematic for McGuire, Woods to argue on appeal of Diamond's tax fraud conviction that "Reynolds" had improperly influenced Diamond's conviction by Judge Merhige. This fact indicates that Dia-

mond knew enough to trigger his obligation, in the exercise of reasonable diligence, to inquire further into the nature and extent of the McGuire, Woods/"Reynolds" relationship.

**4.** It is reasonably inferable from undisputed facts of record that any interest Davis and McGuire, Woods had in arranging for Diamond's tax fraud conviction by Judge Merhige would have been motivated as much by a desire to help David P. Reynolds himself as to help Reynolds Metals.

D. In any event, I shall assume for the sake of argument that Diamond had to learn of the McGuire, Woods/Reynolds Metals connection in order to establish his conspiracy and other claims, and that all the above evidence in Diamond's letters, deposition, and affidavit do not show conclusively that Diamond knew, before he saw the SEC filing in November 1986, that McGuire, Woods represented Reynolds Metals. Even so, it is clear that, despite any fraudulent concealment of the McGuire, Wood/Reynolds Metals relationship, Diamond had enough information more than three years before he filed suit to put him on "inquiry notice" of his conspiracy and related claims through the required exercise of reasonable diligence. More specifically, without question Diamond knew his injury (conviction of tax fraud) and its cause (Judge Merhige's verdict facilitated by McGuire, Woods' recommendation that Diamond opt for a bench trial). The only remaining inquiry notice issue was whether Diamond knew, or in the exercise of reasonable diligence would have known, "some evidence of wrongdoing." *Ante* at 380.

In this connection it is important to recall that in Diamond's October 7, 1985 letter to Harold Kohn, his attorney in the RICO litigation, Diamond showed he knew that McGuire, Woods might have "problems" because Diamond knew the firm had "to deal with [Judge] Merhige," known to Diamond as a friend of the Reynolds family, "every day." Even more significantly, that letter reflected Diamond's awareness that the McGuire, Woods firm "represents Reynolds." Even if Diamond was referring only to representation of David P. Reynolds, Board Chairman of Reynolds Metals Co., any reasonable person in Diamond's situation, given the same information clearly showing McGuire, Woods' possible conflict of interest from representing "Reynolds," would have undertaken diligent efforts to find out whether McGuire, Woods also represented Reynolds Metals Co.—a possibility Diamond surely had reason to entertain because, in his mind, the company was "simply an extension of David Reynolds." There is no reason to believe Diamond could not have learned about such representation either by directly asking his own McGuire, Woods attorney, Carle Davis, or by scrutinizing Reynolds Metals' annual reports or other public documents (such as the company's SEC filings), and thereby acquired an awareness of sufficient facts to identify, at least circumstantially, the alleged conspiracy. In short, in the exercise of reasonable diligence Diamond would have learned of all the relationships necessary to the conspiracy he has alleged on the basis of those relationships and thereby uncovered "some evidence of wrongdoing." [5]

---

For this reason, it is not readily apparent why the particular relationship Diamond says Davis and McGuire, Woods fraudulently concealed—the McGuire, Woods/Reynolds Metals connection—was essential to the conspiracy he has alleged, unless Diamond is prepared to argue what he has never said: that the McGuire, Woods fee potential or other benefits from the firm's Reynolds Metals representation was the critical factor driving the conspiracy, and thus somehow could be divorced from the firm's concern about, and relationship with, David P. Reynolds himself.

5. In the dissenting portion of her opinion, Judge Ruiz says that she cannot conclude "as a matter of law that a reasonable person who had Diamond's suspicions of bias on the part of Judge Merhige [because of his relationship with the Reynolds family] and [Diamond's] knowledge of the professional connection between Judge Merhige and defendants would have conducted an investigation that would have led to discovery of wrongdoing on the part of defendants to Diamond's detriment." *Ante* at 383. Judge Ruiz adds that she cannot conclude "that the undisputed fact that Diamond knew of apparently minor tax representations of a member of the Reynolds family by Davis should have triggered an investigation to discover a broader representation." *Ante* at 384. I might agree if these two groups of relationships could be considered separately. But they cannot. The point is that Diamond had knowledge, *before* September 1986, of three relationships: Judge Merhige's with the Reynolds family; the law firm's with Judge Merhige on behalf of the Reynolds family; and the law firm's with "Reynolds"—meaning at least with David Reynolds, who in Diamond's mind was an alter ego of Reynolds Metals. The premise of Diamond's appeal is that he was unaware of a McGuire, Woods/Reynolds Metals connection, meaning that he would be on notice of the alleged conspiracy once he had that withheld information. In light of Diamond's statement under oath in his September 19, 1993 affidavit that in his mind "Reynolds Metals was simply an extension of David Reynolds," I believe he had information which, in the exercise of reasonable diligence, would have led, before the limitation period expired, not only to "some evidence of wrongdoing" but, more significantly, to the very conspiracy Diamond eventually identified.

On this record, therefore, Diamond should be deemed as a matter of law to have had "inquiry notice" of his claims more than three years before he filed suit, despite alleged fraudulent concealment of the McGuire, Woods/Reynolds Metals relationship. Diamond's suit accordingly is barred by the statute of limitations.

## II.

Although I conclude that affirmance is required under the discovery rule "inquiry notice" standard the majority has applied here, I believe that this is the wrong standard for fraudulent concealment cases, and that the majority is creating bad law for future cases in which the difference in standards will make a difference in results. *See, e.g., Jones v. Meridian Towers Apartments, Inc.,* 816 F.Supp. 762 (D.D.C.1993) (concluding, in case of fraudulent concealment, that plaintiffs had inquiry notice but not the "heightened notice" necessary to begin running of statute of limitations). On the proffered facts of this case, however, seen in the light most favorable to Diamond, I conclude that even under the correct standard the judgment should be affirmed.

### A. The Discovery Rule and "Inquiry Notice"

For statute of limitations purposes a claim usually accrues at the time an injury occurs. *See Bussineau v. President and Directors of Georgetown College,* 518 A.2d 423, 425 (D.C. 1986). We have said, however, that "where the relationship between the fact of injury and the alleged tortious conduct is obscure"—for example, in a medical malpractice action where it is unclear that a physician's negligence caused particular pain or failure to heal—a "discovery rule" is applied "to determine when the statute of limitations

commences." *Id.* (citations omitted). Under this rule, the claim does not accrue until one knows—or by the exercise of reasonable diligence should know—of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *See Knight v. Furlow,* 553 A.2d 1232, 1234 (D.C.1989); *Bussineau,* 518 A.2d at 425–26.

The discovery rule, therefore, incorporates a species of "inquiry notice." *Id.,* 518 A.2d at 427; *Kelton v. District of Columbia,* 413 A.2d 919, 921 (D.C.1980). As a consequence, the period of limitations, although tolled for awhile, begins to run as soon as the three criteria defining the required inquiry are satisfied; it does not await the injured person's discovery of all the essential elements of a possible claim: duty, breach, causation, damages. *See id.,* 413 A.2d at 921 n. 4.[6] Indeed, in *Bussineau,* in holding that a plaintiff can be on inquiry notice by knowing, or having reason to know, only "some evidence of wrongdoing"—for example, an awareness of "possible negligence," *id.,* 518 A.2d at 431— we explicitly stated a restriction: the District of Columbia rule does not extend as far as the rule, adopted in some states, that a plaintiff will not have inquiry notice until aware of "all" the essential elements of the claim. *Id.* at 431 n. 11; *see id.* at 433–35.

Thus, the discovery rule not only tolls the statute of limitations but, at the same time, effectively creates a duty of inquiry; that is, an injured person will be deemed to have legal notice of the claim, and the statute of limitations will begin to run, not only when that person actually learns about the claim but also as of any earlier time the injured person can be said to have "inquiry notice" of the claim and fails to discover available details.[7] To be as clear as possible: the concept of inquiry notice under the discovery

---

**6.** *See also Baker v. A.H. Robins Co., Inc.,* 613 F.Supp. 994, 996 (D.D.C.1985) ("The fact that [plaintiff] did not then comprehend the full extent of *all* possible sequelae does not matter, for the law of limitations requires only that she have inquiry notice of the existence of a *cause of action* for personal injury.").

**7.** We have held in another context not involving personal injury that one is legally on notice—on "inquiry notice"—of an unrecorded interest in

real property when he or she "is aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances." *Clay Properties v. The Washington Post,* 604 A.2d 890, 895 (D.C.1992) (en banc). In that situation, one is deemed "on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed," *id.,* even though the inquiry had not been made.

rule, articulated in cases of injury to another person such as *Knight* and *Bussineau*, means that a potential plaintiff may be legally accountable for investigating a possible claim *before* learning "some evidence of wrongdoing." The facts deemed sufficient to warrant an inquiry presumably are clear enough to lead a potential plaintiff to evidence of wrongdoing, and thus they are sufficient to justify commencement of the limitation period as of the time a plaintiff should have discovered some wrongdoing in the exercise of due diligence, even though the plaintiff has not done so. The assumption underlying commencement of the limitation period based merely on inquiry notice is that the potential plaintiff, in the exercise of reasonable diligence, not only will soon learn evidence of wrongdoing but also, through further investigation, eventually will learn sufficient details of a claim to justify filing suit before the applicable limitation period expires.

### B. Fraudulent Concealment and "Heightened Notice"

Paralleling the discovery rule is another tolling rule that applies, not when the relationship between the injury and actionable conduct is merely "obscure," *Bussineau*, 518 A.2d at 425, but when that relationship, more significantly, has been "fraudulently concealed." A fraudulent concealment occurs in either of two ways: (1) when the defendant has taken affirmative steps to prevent discovery of the claim or its underlying facts, *see*

*Bailey v. Greenberg,* 516 A.2d 934, 941 (D.C. 1986); *Estate of Chappelle v. Sanders,* 442 A.2d 157, 158 (D.C.1982),[8] or (2) when the defendant, acting as a fiduciary, has failed to speak about a matter to its principal while having a duty to do so, *see Searl v. Earll,* 95 U.S.App.D.C. 151, 155–56, 221 F.2d 24, 27–29 (1954).[9]

Obviously, "the doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on [actual] notice of a potential claim." *Hobson v. Wilson,* 237 U.S.App.D.C. 219, 253, 737 F.2d 1, 35 (1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142. Furthermore, we have recognized that, even when there is fraudulent concealment, a plaintiff without actual notice of a wrong may nonetheless learn enough facts—have enough notice—to justify commencement of the statute of limitations period. We have variously stated this notice requirement, however, without defining how it differs, if at all, from inquiry notice under the discovery rule.

Over the last century, the United States Court of Appeals for the District of Columbia Circuit, and later this court, have taken an almost uniform approach to fraudulent concealment. Beginning with *Lewis v. Denison,* 2 App.D.C. 387 (1894), the circuit court said:

> the bar of the statute of limitations will not commence to run in equity until the fraud has been discovered, or until such time as by the use of ordinary care it *might reasonably have been discovered.*

---

**8.** *See also William J. Davis, Inc. v. Young,* 412 A.2d 1187, 1191 (D.C.1980) ("the defendant must have done something of an affirmative nature designed to prevent discovery of the cause of action."). *Richards v. Mileski,* 213 U.S.App.D.C. 220, 225, 662 F.2d 65, 70 (1981) ("Fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any word or act tending to suppress the truth is enough."); *Adrian v. American Security & Trust Co.,* 211 A.2d 771, 772 (D.C.1965) ("Even concealment or silence is not enough absent some trick or connivance by the bank to exclude a suspicion or to prevent discovery of the right of action by use of ordinary diligence."); *Poole v. Terminix Co. of Maryland & Washington,* 84 A.2d 699, 702 (D.C.Mun.App.1951) ("Concealment by mere silence is not enough. There must be some trick or connivance intended to exclude suspicion and

to prevent discovery of the cause of action by the use of ordinary diligence.").

**9.** *See also Riddell v. Riddell Washington Corp.,* 275 U.S.App.D.C. 362, 377–78, 866 F.2d 1480, 1495–96 (1989) (where there is fiduciary duty to disclose information, failure to do so constitutes fraudulent concealment); *Bergen v. L.F. Rothschild, Unterberg, Towbin,* 685 F.Supp. 1, 2–3 (D.D.C.1988) (in action against securities brokers for churning, "plaintiffs' failure to plead affirmative acts by defendants [securities brokers] to conceal the amount of trading is not dispositive on the issue of whether plaintiffs have pled sufficient facts to toll the statute of limitations"); *General Aircraft Corp. v. Air America, Inc.,* 482 F.Supp. 3, 8 (D.D.C.1979) ("absent a duty to speak, mere silence, nondisclosure or denial is not sufficient to toll the statute").

*Id.* at 391 (emphasis added). Two decades later, in *P.H. Sheehy Company v. Eastern Importing & Mfg. Company,* 44 App.D.C. 107 (1915), the court cited *Lewis* but stated the test somewhat differently:

> the statute of limitation only began to run from the time when plaintiff, by the exercise of ordinary diligence *under all the circumstances of the case, ought to have ascertained* the facts of this breach of the warranty.

*Id.* at 112 (emphasis added). Thereafter, the courts virtually alternated between the *Lewis* formulation [10] and the *P.H. Sheehy* formulation,[11] basically a "could have known" versus a "should have known" test.

But whatever test is the proper one (this court has used "should have" five times and "could have" three times), this aspect of the due diligence test is only a minor part of the issue, and not of particular relevance here.[12] More importantly, neither *Lewis* nor *P.H. Sheehy*—nor any of the other cited cases— discusses the nature or amount of knowledge that triggers the due diligence obligation. At the most, in *P.H. Sheehy,* the court refers to "the exercise of ordinary diligence under all the circumstances of the case." *Id.* at 112. So the question remains: when there is fraudulent concealment, is the information threshold that triggers due diligence equal to—or higher than—the threshold that satisfies the "inquiry notice" standard under the "discovery rule"?

Unquestionably, the "due diligence" requirements sound the same, respectively, under the tests for inquiry notice in "obscurity" cases (invoking the discovery rule) and in "fraudulent concealment" cases; but, the extent of the diligence required in actual fact can be quite different in these respective instances if the nature and amount of information sufficient to trigger the diligence inquiry in obscurity cases is different from the level of information required to trigger due diligence in fraudulent concealment cases.

*Lewis* merely said:

> If it was made to appear on the trial that the defendant left the fraud concealed, or that it was of such a nature as to remain concealed after perpetration, and that therefore plaintiff did not discover it, *nor discover any facts sufficient to put him [or her] upon inquiry, which if followed with ordinary diligence would have led to its discovery,* until within three years before

---

**10.** *Poole v. Terminix Co. of Maryland & Washington,* 84 A.2d 699, 700 (D.C.Mun.App.1951) ("by the exercise of reasonable diligence the fraud *could have been discovered*") (emphasis added); *Westinghouse Electric Corp. v. City of Burlington Vermont,* 122 U.S.App.D.C. 65, 67, 351 F.2d 762, 764 (1965) ("by the exercise of due diligence *could have known,* that he may have had a cause of action") (emphasis added); *Emmett v. Eastern Dispensary and Casualty Hospital,* 130 U.S.App. D.C. 50, 57, 396 F.2d 931, 938 (1967) ("by the exercise of due diligence *could have known* that he may have had a cause of action") (emphasis added); *Fitzgerald v. Seamans,* 180 U.S.App.D.C. 75, 83, 553 F.2d 220, 228 (1977) ("by reasonable diligence *could have discovered,* the basis of the lawsuit") (emphasis added); *Weisberg v. Williams, Connolly & Califano,* 390 A.2d 992, 996 (D.C.App.1978) ("by the exercise of due diligence *could have known,* that he may have had a cause of action") (emphasis added); *Estate of Chappelle v. Sanders,* 442 A.2d 157–58 (D.C.App. 1982) ("by the exercise of due diligence *could have known,* that he may have had a cause of action") (emphasis added).

**11.** *Wiren v. Paramount Pictures,* 92 U.S.App.D.C. 347, 349, 206 F.2d 465 (1953) ("from the time such facts *should reasonably have been ascertained* in the exercise of due diligence") (emphasis added); *Kraft v. Lowe,* 77 A.2d 554, 557–58

(D.C.Mun.App.1950) ("from the time when the facts *should have reasonably been found out* in the exercise of due diligence") (emphasis added); *White v. Piano Mart,* 110 A.2d 542, 543 (D.C.Mun.App.1995) ("from the time when the facts *should have reasonably been found out* in the exercise of due diligence") (emphasis added); *Maddox v. Andy's Refrigeration & Motor Service Co.,* 160 A.2d 799, 800 (D.C.Mun.App.1960) ("from the time when such facts *should have been ascertained* by due diligence") (emphasis added); *King v. Kitchen Magic, Inc.,* 391 A.2d 1184, 1186 (D.C.1978) ("from the time the fraud either is discovered or *reasonably should have been discovered*") (emphasis added); *William J. Davis, Inc. v. Young,* 412 A.2d 1187, 1193 (D.C. 1980) (claim "did not accrue until he discovered, or *reasonably should have discovered,* facts indicating that such a claim existed") (citing *Fitzgerald,* 180 U.S.App.D.C. at 83, 553 F.2d at 228 ("by reasonable diligence *could have discovered*") (emphasis added)).

**12.** Presumably, either formulation means the plaintiff would have discovered the claim—and is legally accountable for doing so—if the plaintiff had conducted a reasonably diligent inquiry based on sufficient information at hand.

the time of filing his [or her] suit, the statute of limitations will be no bar to his [or her] recovery.

2 App.D.C. at 393 (emphasis added). Despite use of the word "inquiry," this language did not come to grips, any more than the language of *P.H. Sheehy* did, with the question of how high the information threshold must be, *i.e.*, what "facts" are "sufficient" to put a plaintiff on notice of a fraudulently concealed claim. As far as I have been able to discover by reading the cases, moreover, no decision in this jurisdiction had ever discussed the question whether the information threshold is the same or different for discovery rule cases and for fraudulent concealment cases until the D.C. Circuit addressed that issue in *Hobson v. Wilson*, 237 U.S.App. D.C. 219, 253, 737 F.2d 1, 35 (1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).[13]

*Hobson* concerned claims that agents of the FBI, of the Metropolitan Police Department, and of the District of Columbia itself had conspired, using various secret and deceptive schemes in violation of plaintiffs' statutory and constitutional rights, "to impede plaintiffs' efforts to associate with others for the purpose of publicly expressing opposition to the Vietnam War, national and local Government race relations policies, and other Government activities." *Id.* at 228, 737 F.2d at 9. Among the issues was the question whether claims of certain plaintiffs who had prevailed at trial were barred by the three-year statute of limitations.

The plaintiffs in *Hobson* replied to the limitations defense by alleging fraudulent concealment. Apparently because of potentially important case law distinctions applicable to the notice issue, the court focused initially on the situation where fraud is part of the claim itself (in contrast, for example, with a claim for personal injury). More specifically, the court distinguished cases of "self-concealing" fraud from cases of actively concealed fraud. *Id.* at 252 & n. 102, 737 F.2d at 33 & n. 102. In the first, "the concealment is inherent in the fraud itself"; the deception "is a necessary step in carrying out the illegal act." *Id.* at 252 n. 102, 737 F.2d at 33 n. 102. In the second, "the defendant has engaged in affirmative acts of concealing beyond the original fraud itself"; *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1127 (6th Cir.1982); "the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed." *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir.1995); *see Hobson*, 237 U.S.App. D.C. at 253–54, 737 F.2d at 33–34.

The distinction is important in showing how seriously the courts have taken fraud in tolling the statute of limitations. Under the equitable tolling rule in some federal circuits, when there is evidence of the second or "active" kind of fraudulent concealment—in effect compounding the initial fraud, making it all the more difficult to discover—the statute of limitations does not begin to run until the plaintiff has actual notice of the facts necessary to bringing the claim, without any limiting requirement of due diligence whatsoever. *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2d Cir.1979); *Tomera*, 511 F.2d at 510. *Contra Campbell*, 676 F.2d at 1128 (due diligence required when active concealment, as well as self-concealment, is shown). Actual notice, therefore, is often required to lift the tolling of the limitation period as the price for fraud-on-fraud or double fraud.[14]

The present case (like *Hobson*) concerns only self-concealing fraud: the alleged

---

13. This court in *William J. Davis, Inc.*, 412 A.2d at 1193 n. 16, and in *Weisberg*, 390 A.2d at 996 n. 8, earlier had noted that the "reasonably could/should have discovered" rule, applicable in cases of fraudulent concealment, is "similar" to the approach taken under the discovery rule. But in both footnotes we left it at that, implying that there may be a difference but that any definitive comparison of the two would await another day.

14. There are claims, such as those for personal injury, which are not premised in any way on

fraud but nonetheless may involve fraudulent concealment because the defendant affirmatively covers up facts in support of the claim. Because there is only a single layer of fraud, these cases do not fall into the active concealment category that the courts have associated with fraud-on-fraud; rather, these cases are treated for notice purposes like the self-concealing fraud cases, which involve a single layer of fraud. *See e.g., Bailey*, 516 A.2d at 941; *Estate of Chappelle*, 442 A.2d at 158; *supra* note 8.

breach of Davis's and the McGuire, Woods law firm's fiduciary obligation, as Diamond's attorneys, to disclose to Diamond their relationship with Reynolds Metals. *See, e.g., Searl,* 95 U.S.App.D.C. at 155–56, 221 F.2d at 27–29; *supra* note 9. Diamond has not alleged, in addition, that Davis and his firm have acted affirmatively to negate or hide that Reynolds relationship. *Compare Robertson,* 609 F.2d at 593 (remanding on issue of fraudulent concealment where accounting firm not only certified fraudulent financial statement but also affirmatively sought to cover up by altering work papers and destroying documentary evidence). Accordingly, any tolling here based on fraudulent concealment must hold Diamond accountable for the required due diligence. *See, e.g., Hobson,* 237 U.S.App.D.C. at 252–54, 737 F.2d at 33–35; *Richards v. Mileski,* 213 U.S.App. D.C. 220, 226, 662 F.2d 65, 71 (1981); *Wachovia Bank & Trust Co., N.A. v. National Student Mktg. Corp.,* 209 U.S.App.D.C. 9, 16, 650 F.2d 342, 349 (1980); *Smith v. Nixon,* 196 U.S.App.D.C. 276, 283–84, 606 F.2d 1183, 1190–91 (1979); *Fitzgerald v. Seamans,* 180 U.S.App.D.C. 75, 83–84, 553 F.2d 220, 228–29 (1977).

Although Diamond, therefore, has a due diligence responsibility, the facts required to trigger that responsibility when there is self-concealing fraud—and here is where I disagree, fundamentally, with the majority—cannot be as flimsy, indirect, and circumstantial as those that will trigger inquiry notice under the discovery rule. *See Hobson,* 237 U.S.App.D.C. at 254, 737 F.2d at 35.

A claim accrues under the discovery rule when one knows, or by the exercise of reasonable diligence should know—based on evidence as insubstantial as hints, suspicions, and rumors—of an injury, its cause in fact, and *some evidence of wrongdoing.* *See Knight,* 553 A.2d at 1234; *Bussineau,* 518 A.2d at 425–26; *Hobson,* 237 U.S.App.D.C. at 254, 737 F.2d at 35. Inquiry notice, therefore, can arise upon unconfirmed information that, through reasonable diligence, should lead at least to evidence of a suspected, though ill-defined, wrong.

In contrast, according to *Hobson,* a claim will not accrue when there has been self-concealing fraud until the plaintiff is aware of sufficient facts to identify, in the exercise of reasonable diligence, *a particular claim,* not merely some evidence of wrongdoing. *See id.* This means that the factual basis necessary to trigger the exercise of reasonable diligence must be complete and precise enough—a sufficiently clear road map—to direct a diligent plaintiff to a verifiable claim.[15]

In the one case, therefore, the factual basis can be thin, perhaps even out of focus, but enough to trigger the required due diligence to pursue possible evidence of wrongdoing. In the other case, the factual basis must be solid enough, and in sufficient focus, for the required due diligence to reveal an articulable claim. Thus, in the first case, when there is inquiry notice, the plaintiff may have to do considerable investigation thereafter before filing a lawsuit; in the other case, by the time the plaintiff is deemed to have notice, that plaintiff will have close to enough information to go to court.

Judge Harris of the United States District Court in this jurisdiction has characterized this latter notice requirement, triggering due diligence when there has been fraudulent concealment, as a requirement of "heightened" notice of the fraud—"something closer to actual notice than the merest inquiry notice." *Jones,* 816 F.Supp. at 770 (citing *Rid-*

---

**15.** The United States Court of Appeals for the District of Columbia Circuit has perceived no material difference between its analysis when fraudulent concealment is at issue and the law of the District of Columbia. *See Hobson v. Wilson,* 237 U.S.App.D.C. 219, 256 n. 113, 737 F.2d 1, 37 n. 113 (1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). In one respect, however, not relevant to the decision in *Hobson,* District of Columbia law does differ from the law of the District of Columbia Circuit. In *Hobson,* the court ruled that, to negate fraudu-

lent concealment, the plaintiff must be aware not only of "sufficient facts to identify a particular cause of action" but also of facts identifying "the persons responsible for the injury." 237 U.S.App.D.C. at 254, 255, 737 F.2d at 35, 36. In *Estate of Chappelle,* however, we held that fraudulent concealment of the identities of the allegedly liable parties, when the existence of the cause of action itself was known, did not toll the running of the statute of limitations. 442 A.2d at 158–59.

dell v. Riddell Washington Corp., 275 U.S.App.D.C. 362, 373, 866 F.2d 1480, 1491 (1989)).[16] Obviously, all notice requirements, short of actual notice, are somewhat elusive and hard to define, but the case law has come to apply two different standards, inquiry notice and heightened notice—however imperfectly articulated each may be—when there is tolling, respectively, under the discovery rule for obscurely caused injuries and under a regime of fraudulent concealment for even harder to identify claims.

The foregoing analysis makes clear, I trust, that although both "inquiry" notice based on the discovery rule and "heightened" notice based on fraudulent concealment require the plaintiff to exercise "reasonable" or "due" diligence in ascertaining the claim, the "facts sufficient"[17] to trigger the diligence obligation under those respective notice regimes are at two different levels. The threshold in fraudulent concealment cases is substantially higher for the obvious reason that fraud makes most claims more difficult to discover, and thus a prospective plaintiff should be entitled to more leeway in uncovering the claim before the statute of limitations begins to run. See Riddell, 275 U.S.App. D.C. at 373, 866 F.2d at 1491.

In light of the case law, therefore, how shall the "heightened" notice test be formulated, with a view to proper jury instructions? Before Hobson, the D.C. Circuit had "refined its approach to cases involving self-concealing wrongs," Hobson, 237 U.S.App. D.C. at 254, 737 F.2d at 35 (emphasis omitted), and provided the following test for required due diligence:

> The test of due diligence [when there has been fraudulent concealment] measures the plaintiff's efforts to uncover his [or her] cause of action against what a reasonable person would have done in his [or her] situation *given the same information.*

Richards v. Mileski, 213 U.S.App.D.C. 220, 226, 662 F.2d 65, 71 (1981) (emphasis added). Then, on the same page in Richards, the

court suggested that when there is fraudulent concealment, a reasonable prospective plaintiff will not be accountable for failure to pursue a claim, in the exercise of due diligence, unless the given information provides "special reason" to pursue it. Id. "Special reason," therefore, is the idea—the concept— that triggers "heightened notice." Mere "hints, suspicions, hunches or rumors" can comprise the lesser kind of information that puts a plaintiff on "inquiry notice." Hobson, 237 U.S.App.D.C. at 254, 737 F.2d at 35; see Riddell, 275 U.S.App.D.C. at 376, 866 F.2d at 1494. But when there is fraudulent concealment, the plaintiff will have "heightened" notice, and thus will be held responsible for due diligence, only when (as I would formulate the test derived from the case law):

> a plaintiff knows the specifics of a particular claim, or confronts disclosed facts giving special reason to undertake a search, in the exercise of due diligence, that is likely to reveal the specifics of a particular claim.

In summary, when there is fraudulent concealment, "inquiry notice" under the discovery rule ordinarily comes earlier than "heightened notice" because, presumably, lesser quality information is required to generate "some evidence of wrongdoing," in the exercise of due diligence, than the kind of information required to generate the details of a particular claim. Because under either form of notice a plaintiff presumably will have time to ascertain the details necessary for a lawsuit within the prescribed limitation period, the "heightened notice" standard in effect allows a prospective plaintiff who is the victim of fraudulent concealment a head start—before the limitation period begins— over a plaintiff who is not impeded by an effort to cover up the claim.

Perhaps one way of making the comparison would be to say that, when there is "obscurity" but no "fraudulent concealment," there may be inquiry notice based on hints or rumors that, in the exercise of reasonable

---

16. Judge Ruiz writes at some length, see *ante* at 376–79, about the inconsistency she perceives between *Hobson* and *Riddell*, a case in which there were jury issues both of self-concealing fraud and of actively concealed fraud in connection with valuation of a business. A close read-

ing of both cases reveals no inconsistency. In any event, I do not understand why any possible inconsistency would be relevant here.

17. *Lewis,* 2 App.D.C. at 393.

diligence, would lead to "some evidence of wrongdoing"—followed by further investigation that eventually would uncover the details of a claim. In contrast, when there is fraudulent concealment, probably "some evidence of wrongdoing" itself will be enough—and perhaps necessary—to give the "special reason" required to trigger an inquiry, in the exercise of reasonable diligence, that will lead to the particulars of a claim. When, for example, an attorney fails to disclose important information to a client, with the result that the client keeps trusting the attorney, that fraudulent concealment will suffice to cover up the significance of hints or rumors that might otherwise suggest deception, and thus will continue to toll the statute of limitations until harder information comes the client's way, giving special reason to pursue the matter. Visually, the comparison can be shown as follows:

DISCOVERY RULE

FRAUDULENT CONCEALMENT

limitation
period
begins

5. knows or should know "specifics of a particular claim"

3. *Heightened notice:* knows or should know "specifics of a particular claim"

4. FURTHER INVESTIGATION

2. EXERCISE OF DUE DILIGENCE

limitation
period
begins

3. *Inquiry Notice:* knows or should know "some evidence of wrongdoing"

1. Facts providing "special reason" to pursue a particular claim

2. EXERCISE OF DUE DILIGENCE

1. Facts, hints, rumors indicating wrongdoing

Assume knowledge, or in exercise of due diligence reason to know, of "injury" and its "cause in fact," but no knowledge of wrongdoing

*Time Line*

## 396

### C. Disposition

In this case, even under a heightened notice standard, I conclude that Diamond's claim is time barred. He had actual notice of the Merhige/Reynolds relationship, of Davis and McGuire, Woods' knowledge of that relationship, and of Davis and McGuire, Woods' attorney-client relationship with Judge Merhige as the Reynolds executor. He also had actual knowledge that Davis, and thus McGuire, Woods, had an attorney-client relationship with David Reynolds, whom he considered an alter ego of Reynolds Metals ("simply an extension of David Reynolds"). As early as October 7, 1985 in his letter to attorney Harold Kohn, Diamond acknowledged that McGuire, Woods might have "problems" handling his criminal appeal because Diamond was aware that the firm had "to deal with Merhige," a friend of the Reynolds family, "every day."

Under these circumstances, Diamond had "facts sufficient," *Lewis*, 2 App.D.C. at 393, to put him on heightened notice of his conspiracy claim. The disclosed facts were enough to suggest the kind of relationship between Davis (or McGuire, Woods) and Reynolds Metals that supplied what Diamond himself has said was the only missing piece of information necessary to suggest a Merhige/Reynolds Metals/McGuire, Woods conspiracy. More specifically, the disclosed facts gave Diamond special reason to undertake a search that, in the exercise of due diligence, was likely to reveal the specifics required for filing his conspiracy claim.

\*　　\*　　\*

For the foregoing reasons, I concur in the judgment to affirm but respectfully dissent from the majority's failure to recognize the "heightened" notice standard that applies in such cases of fraudulent concealment.